STANLEY J. WILKES vs. SPRINGSIDE NURSING HOME, INC.
& others.[1]

Berkshire.    March 2, 1976. — August 20, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, BRAUCHER, &
KAPLAN, JJ.

Corporation, Stockholder, Close corporation.    Fiduciary.

Stockholders in a close corporation owe one another substantially the
same fiduciary duty in the operation of the enterprise that partners
owe to one another, namely, a duty of the utmost good faith and
loyalty.  [848-849]

Directors, officers and members of a majority stockholders' group in a
close corporation who severed a minority stockholder from the pay-
roll of the corporation and refused to reelect him as a salaried
officer and director breached their fiduciary duty to the minority
stockholder where there was no showing of misconduct on the part
of the minority stockholder as a director, officer or employee of the
corporation and where it appeared that the action was intended to
pressure the minority stockholder into selling his shares to the cor-
poration at a price below their value.  [849-853]

BILL IN EQUITY filed in the Probate Court for the County
of Berkshire on August 5, 1971.

The suit was heard by Nuciforo, J., on a master's report.

The Supreme Judicial Court granted a request for direct
appellate review.

David J. Martel (James F. Egan with him) for the
plaintiff.

Stephen B. Hibbard for the First Agricultural National
Bank of Berkshire County & another, executors.

William W. Simons for the Springside Nursing Home,
Inc., & others.

---

[1] Barbara Quinn (executrix under the will of T. Edward Quinn),
Leon L. Riche, and the First Agricultural National Bank of Berkshire
County and Frank Sutherland MacShane (executors under the will of
Lawrence R. Connor).

HENNESSEY, C.J. On August 5, 1971, the plaintiff (Wilkes) filed a bill in equity for declaratory judgment in the Probate Court for Berkshire County,[2] naming as defendants T. Edward Quinn (Quinn),[3] Leon L. Riche (Riche), the First Agricultural National Bank of Berkshire County and Frank Sutherland MacShane as executors under the will of Lawrence R. Connor (Connor), and the Springside Nursing Home, Inc. (Springside or the corporation). Wilkes alleged that he, Quinn, Riche and Dr. Hubert A. Pipkin (Pipkin)[4] entered into a partnership agreement in 1951, prior to the incorporation of Springside, which agreement was breached in 1967 when Wilkes's salary was terminated and he was voted out as an officer and director of the corporation. Wilkes sought, among other forms of relief, damages in the amount of the salary he would have received had he continued as a director and officer of Springside subsequent to March, 1967.

A judge of the Probate Court referred the suit to a master, who, after a lengthy hearing, issued his final report in late 1973. Wilkes's objections to the master's report were overruled after a hearing, and the master's report was confirmed in late 1974. A judgment was entered dismissing Wilkes's action on the merits. We granted direct appellate review. Mass. R. A. P. 11, 365 Mass. 854 (1974). On appeal, Wilkes argued in the alternative that (1) he should recover damages for breach of the alleged partnership agreement; and (2) he should recover damages because the defendants, as majority stockholders in Springside, breached

---

[2] Wilkes urged the court, inter alia, to declare the rights of the parties under (1) an alleged partnership agreement entered into in 1951 between himself, T. Edward Quinn (see note 3 *infra*), Leon L. Riche and Dr. Hubert A. Pipkin (see note 4 *infra*); and (2) certain portions of a stock transfer restriction agreement executed by the four original stockholders in the Springside Nursing Home, Inc., in 1956.

[3] T. Edward Quinn died while this action was sub judice. The executrix of his estate has been substituted as a party-defendant. See note 1 *supra*.

[4] Dr. Pipkin transferred his interest in Springside to Connor in 1959 and is not a defendant in this action.

their fiduciary duty to him as a minority stockholder by their action in February and March, 1967.

We conclude that the master's findings were warranted by the evidence and that his report was properly confirmed. However, we reverse so much of the judgment as dismisses Wilkes's complaint and order the entry of a judgment substantially granting the relief sought by Wilkes under the second alternative set forth above.[5]

A summary of the pertinent facts as found by the master is set out in the following pages. It will be seen that, although the issue whether there was a breach of the fiduciary duty owed to Wilkes by the majority stockholders in Springside was not considered by the master, the master's report and the designated portions of the transcript of the evidence before him supply us with a sufficient basis for our conclusion.

In 1951 Wilkes acquired an option to purchase a building. and lot located on the corner of Springside Avenue and North Street in Pittsfield, Massachusetts, the building having previously housed the Hillcrest Hospital. Though Wilkes was principally engaged in the roofing and siding business, he had gained a reputation locally for profitable dealings in real estate. Riche, an acquaintance of Wilkes, learned of the option, and interested Quinn (who was known to Wilkes through membership on the draft board in Pittsfield) and Pipkin (an acquaintance of both Wilkes and Riche) in joining Wilkes in his investment. The four men met and decided to participate jointly in the purchase of the building and lot as a real estate investment which, they believed, had good profit potential on resale or rental.

The parties later determined that the property would have its greatest potential for profit if it were operated by them as a nursing home. Wilkes consulted his attorney, who advised him that if the four men were to operate the

[5] In view of our conclusion it is unnecessary to consider Wilkes's specific objections to the master's report and to the confirmation of that report by the judge below.

contemplated nursing home as planned, they would be partners and would be liable for any debts incurred by the partnership and by each other. On the attorney's suggestion, and after consultation among themselves, ownership of the property was vested in Springside, a corporation organized under Massachusetts law.

Each of the four men invested $1,000 and subscribed to ten shares of $100 par value stock in Springside.[6] At the time of incorporation it was understood by all of the parties that each would be a director of Springside and each would participate actively in the management and decision making involved in operating the corporation.[7] It was, further, the understanding and intention of all the parties that, corporate resources permitting, each would receive money from the corporation in equal amounts as long as each assumed an active and ongoing responsibility for carrying a portion of the burdens necessary to operate the business.

The work involved in establishing and operating a nursing home was roughly apportioned, and each of the four men undertook his respective tasks.[8] Initially, Riche was

---

[6] On May 2, 1955, and again on December 23, 1958, each of the four original investors paid for and was issued additional shares of $100 par value stock, eventually bringing the total number of shares owned by each to 115.

[7] Wilkes testified before the master that, when the corporate officers were elected, all four men "were . . . guaranteed directorships." Riche's understanding of the parties' intentions was that they all wanted to play a part in the management of the corporation and wanted to have some "say" in the risks involved; that, to this end, they all would be directors; and that "unless you [were] a director and officer you could not participate in the decisions of [the] enterprise."

[8] Wilkes took charge of the repair, upkeep and maintenance of the physical plant and grounds; Riche assumed supervision over the kitchen facilities and dietary and food aspects of the home; Pipkin was to make himself available if and when medical problems arose; and Quinn dealt with the personnel and administrative aspects of the nursing home, serving informally as a managing director. Quinn further coördinated the activities of the other parties and served as a communication link among them when matters had to be discussed and decisions had to be made without a formal meeting.

elected president of Springside, Wilkes was elected treasurer, and Quinn was elected clerk.[9] Each of the four was listed in the articles of organization as a director of the corporation.

At some time in 1952, it became apparent that the operational income and cash flow from the business were sufficient to permit the four stockholders to draw money from the corporation on a regular basis. Each of the four original parties initially received $35 a week from the corporation. As time went on the weekly return to each was increased until, in 1955, it totalled $100.

In 1959, after a long illness, Pipkin sold his shares in the corporation to Connor, who was known to Wilkes, Riche and Quinn through past transactions with Springside in his capacity as president of the First Agricultural National Bank of Berkshire County. Connor received a weekly stipend from the corporation equal to that received by Wilkes, Riche and Quinn. He was elected a director of the corporation but never held any other office. He was assigned no specific area of responsibility in the operation of the nursing home but did participate in business discussions and decisions as a director and served additionally as financial adviser to the corporation.

In 1965 the stockholders decided to sell a portion of the corporate property to Quinn who, in addition to being a stockholder in Springside, possessed an interest in another corporation which desired to operate a rest home on the property. Wilkes was successful in prevailing on the other stockholders of Springside to procure a higher sale price for the property than Quinn apparently anticipated paying or desired to pay. After the sale was consummated, the relationship between Quinn and Wilkes began to deteriorate.

The bad blood between Quinn and Wilkes affected the attitudes of both Riche and Connor. As a consequence of

---

[9] Riche held the office of president from 1951 to 1963; Quinn served as president from 1963 on, as clerk from 1951 to 1967, and as treasurer from 1967 on; Wilkes was treasurer from 1951 to 1967.

the strained relations among the parties, Wilkes, in January of 1967, gave notice of his intention to sell his shares for an amount based on an appraisal of their value. In February of 1967 a directors' meeting was held and the board exercised its right to establish the salaries of its officers and employees.[10] A schedule of payments was established whereby Quinn was to receive a substantial weekly increase and Riche and Connor were to continue receiving $100 a week. Wilkes, however, was left off the list of those to whom a salary was to be paid. The directors also set the annual meeting of the stockholders for March, 1967.

At the annual meeting in March,[11] Wilkes was not reelected as a director, nor was he reelected as an officer of the corporation. He was further informed that neither his services nor his presence at the nursing home was wanted by his associates.

The meetings of the directors and stockholders in early 1967, the master found, were used as a vehicle to force Wilkes out of active participation in the management and operation of the corporation and to cut off all corporate payments to him. Though the board of directors had the power to dismiss any officers or employees for misconduct or neglect of duties, there was no indication in the minutes of the board of directors' meeting of February, 1967, that the failure to establish a salary for Wilkes was based on either ground. The severance of Wilkes from the payroll resulted not from misconduct or neglect of duties, but because of the personal desire of Quinn, Riche and Connor to prevent him from continuing to receive money from the

---

[10] The by-laws of the corporation provided that the directors, subject to the approval of the stockholders, had the power to fix the salaries of all officers and employees. This power, however, up until February, 1967, had not been exercised formally; all payments made to the four participants in the venture had resulted from the informal but unanimous approval of all the parties concerned.

[11] Wilkes was unable to attend the meeting of the board of directors in February or the annual meeting of the stockholders in March, 1967. He was represented, however, at the annual meeting by his attorney, who held his proxy.

corporation. Despite a continuing deterioration in his personal relationship with his associates, Wilkes had consistently endeavored to carry on his responsibilities to the corporation in the same satisfactory manner and with the same degree of competence he had previously shown. Wilkes was at all times willing to carry on his responsibilities and participation if permitted so to do and provided that he receive his weekly stipend.

1. We turn to Wilkes's claim for damages based on a breach of fiduciary duty owed to him by the other participants in this venture. In light of the theory underlying this claim, we do not consider it vital to our approach to this case whether the claim is governed by partnership law or the law applicable to business corporations. This is so because, as all the parties agree, Springside was at all times relevant to this action, a close corporation as we have recently defined such an entity in *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 585-586 (1975).

In *Donahue*,[12] we held that "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *Id.* at 593 (footnotes omitted). As determined in previous decisions of this court, the standard of duty owed by partners to one another is one of "utmost good faith and loyalty." *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952), and cases cited. *DeCotis* v. *D'Antona*, 350 Mass. 165, 168 (1966), quoting from *Mendelsohn* v. *Leather Mfg. Corp.*, 326 Mass. 226, 233 (1950). Thus, we concluded in *Donahue*, with regard to "their actions relative to the operations of the enterprise and the effects of that operation on the rights and investments of other stockholders," "[s]tockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard.

---

[12] For legal commentary relating to the *Donahue* case, see 89 Harv. L. Rev. 423 (1975); 60 Mass. L. Q. 318 (1975); 21 Vill. L. Rev. 307 (1976).

They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." 367 Mass. at 593 n.18.

In the *Donahue* case we recognized that one peculiar aspect of close corporations was the opportunity afforded to majority stockholders to oppress, disadvantage or "freeze out" minority stockholders. In *Donahue* itself, for example, the majority refused the minority an equal opportunity to sell a ratable number of shares to the corporation at the same price available to the majority. The net result of this refusal, we said, was that the minority could be forced to "sell out at less than fair value," 367 Mass. at 592, since there is by definition no ready market for minority stock in a close corporation.

"Freeze outs," however, may be accomplished by the use of other devices. One such device which has proved to be particularly effective in accomplishing the purpose of the majority is to deprive minority stockholders of corporate offices and of employment with the corporation. F.H. O'Neal, "Squeeze-Outs" of Minority Shareholders 59, 78-79 (1975). See 367 Mass. at 587, 589. This "freeze-out" technique has been successful because courts fairly consistently have been disinclined to interfere in those facets of internal corporate operations, such as the selection and retention or dismissal of officers, directors and employees, which essentially involve management decisions subject to the principle of majority control. See Note, 35 N.C. L. Rev. 271, 277 (1957). As one authoritative source has said, "[M]any courts apparently feel that there is a legitimate sphere in which the controlling [directors or] shareholders can act in their own interest even if the minority suffers." F.H. O'Neal, *supra* at 59 (footnote omitted). Comment, 1959 Duke L.J. 436, 437.

The denial of employment to the minority at the hands of the majority is especially pernicious in some instances. A guaranty of employment with the corporation may have been one of the "basic reason[s] why a minority owner has invested capital in the firm." Symposium — The Close Corporation, 52 Nw. U.L. Rev. 345, 392 (1957). See F.H.

O'Neal, *supra* at 78-79; Hancock, Minority Interests in Small Business Entities, 17 Clev.-Mar. L. Rev. 130, 132-133 (1968); 89 Harv. L. Rev. 423, 427 (1975). The minority stockholder typically depends on his salary as the principal return on his investment, since the "earnings of a close corporation . . . are distributed in major part in salaries, bonuses and retirement benefits." 1 F.H. O'Neal, Close Corporations § 1.07 (1971).[13] Other noneconomic interests of the minority stockholder are likewise injuriously affected by barring him from corporate office. See F.H. O'Neal, "Squeeze-Outs" of Minority Shareholders 79 (1975). Such action severely restricts his participation in the management of the enterprise, and he is relegated to enjoying those benefits incident to his status as a stockholder. See Symposium — The Close Corporation, 52 Nw. U.L. Rev. 345, 386 (1957). In sum, by terminating a minority stockholder's employment or by severing him from a position as an officer or director, the majority effectively frustrate the minority stockholder's purposes in entering on the corporate venture and also deny him an equal return on his investment.

The *Donahue* decision acknowledged, as a "natural outgrowth" of the case law of this Commonwealth, a strict obligation on the part of majority stockholders in a close corporation to deal with the minority with the utmost good faith and loyalty. On its face, this strict standard is applicable in the instant case. The distinction between the majority action in *Donahue* and the majority action in this case is more one of form than of substance. Nevertheless, we are concerned that untempered application of the strict good faith standard enunciated in *Donahue* to cases such as the one before us will result in the imposition of limitations on legitimate action by the controlling group in a close corporation which will unduly hamper its effectiveness in managing the corporation in the best interests of all concerned. The majority, concededly, have certain

---

[13] We note here that the master found that Springside never declared or paid a dividend to its stockholders.

rights to what has been termed "selfish ownership" in the corporation which should be balanced against the concept of their fiduciary obligation to the minority. See Hill, The Sale of Controlling Shares, 70 Harv. L. Rev. 986, 1013-1015 (1957); Note, 44 Iowa L. Rev. 734, 740-741 (1959); Symposium — The Close Corporation, 52 Nw. U.L. Rev. 345, 395-396 (1957).

Therefore, when minority stockholders in a close corporation bring suit against the majority alleging a breach of the strict good faith duty owed to them by the majority, we must carefully analyze the action taken by the controlling stockholders in the individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action. See *Bryan* v. *Brock & Blevins Co.*, 343 F. Supp. 1062, 1068 (N.D. Ga. 1972), aff'd, 490 F.2d 563, 570-571 (5th Cir. 1974); *Schwartz* v. *Marien*, 37 N.Y.2d 487, 492 (1975); Hancock, Minority Interests in Small Business Entities, 17 Clev.-Mar. L. Rev. 130, 132 (1968); Vorenberg, Exclusiveness of the Dissenting Stockholder's Appraisal Right, 77 Harv. L. Rev. 1189, 1192-1193, 1195-1196, 1204 (1964); Comment, 14 B.C. Ind. & Com. L. Rev. 1252, 1256 (1973); Comment, 1959 Duke L.J. 436, 448, 458; Note, 74 Harv. L. Rev. 1630, 1638 (1961); Note, 35 N.C. L. Rev. 271, 273-275 (1957); Symposium — The Close Corporation, 52 Nw. U.L. Rev. 345, 389 (1957); Comment, 10 Rutgers L. Rev. 723 (1956); Comment, 37 U. Pitt. L. Rev. 115, 118 (1975). In asking this question, we acknowledge the fact that the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. It must have a large measure of discretion, for example, in declaring or withholding dividends, deciding whether to merge or consolidate, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees.

When an asserted business purpose for their action is advanced by the majority, however, we think it is open to minority stockholders to demonstrate that the same legitimate objective could have been achieved through an al-

ternative course of action less harmful to the minority's interest. See *Schwartz* v. *Marien, supra;* Comment, 1959 Duke L.J. 436, 458; Note, 74 Harv. L. Rev. 1630, 1638 (1961); Note, 35 N.C. L. Rev. 271, 273 (1957); Comment, 37 U. Pitt. L. Rev. 115, 132 (1975). If called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative.

Applying this approach to the instant case it is apparent that the majority stockholders in Springside have not shown a legitimate business purpose for severing Wilkes from the payroll of the corporation or for refusing to re-elect him as a salaried officer and director. The master's subsidiary findings relating to the purpose of the meetings of the directors and stockholders in February and March, 1967, are supported by the evidence. There was no showing of misconduct on Wilkes's part as a director, officer or employee of the corporation which would lead us to approve the majority action as a legitimate response to the disruptive nature of an undesirable individual bent on injuring or destroying the corporation. On the contrary, it appears that Wilkes had always accomplished his assigned share of the duties competently, and that he had never indicated an unwillingness to continue to do so.

It is an inescapable conclusion from all the evidence that the action of the majority stockholders here was a designed "freeze out" for which no legitimate business purpose has been suggested. Furthermore, we may infer that a design to pressure Wilkes into selling his shares to the corporation at a price below their value well may have been at the heart of the majority's plan.[14]

In the context of this case, several factors bear directly on the duty owed to Wilkes by his associates. At a minimum, the duty of utmost good faith and loyalty would demand that the majority consider that their action was

[14] This inference arises from the fact that Connor, acting on behalf of the three controlling stockholders, offered to purchase Wilkes's shares for a price Connor admittedly would not have accepted for his own shares.

in disregard of a long-standing policy of the stockholders that each would be a director of the corporation and that employment with the corporation would go hand in hand with stock ownership; that Wilkes was one of the four originators of the nursing home venture; and that Wilkes, like the others, had invested his capital and time for more than fifteen years with the expectation that he would continue to participate in corporate decisions. Most important is the plain fact that the cutting off of Wilkes's salary, together with the fact that the corporation never declared a dividend (see note 13 *supra*), assured that Wilkes would receive no return at all from the corporation.

2. The question of Wilkes's damages at the hands of the majority has not been thoroughly explored on the record before us. Wilkes, in his original complaint, sought damages in the amount of the $100 a week he believed he was entitled to from the time his salary was terminated up until the time this action was commenced. However, the record shows that, after Wilkes was severed from the corporate payroll, the schedule of salaries and payments made to the other stockholders varied from time to time. In addition, the duties assumed by the other stockholders after Wilkes was deprived of his share of the corporate earnings appear to have changed in significant respects.[15] Any resolution of this question must take into account whether the corporation was dissolved during the pendency of this litigation.

Therefore our order is as follows: So much of the judgment as dismisses Wilkes's complaint and awards costs to the defendants is reversed.[16] The case is remanded to the

---

[15] In fairness to Wilkes, who, as the master found, was at all times ready and willing to work for the corporation, it should be noted that neither the other stockholders nor their representatives may be heard to say that Wilkes's duties were performed by them and that Wilkes's damages should, for that reason, be diminished.

[16] We do not disturb the judgment in so far as it dismissed a counterclaim by Springside against Wilkes arising from the payment of money by Quinn to Wilkes after the sale in 1965 of certain property of Springside to a corporation owned at that time by Quinn and his wife. See the discussion at 846, *supra*.

Probate Court for Berkshire County for further proceedings concerning the issue of damages. Thereafter a judgment shall be entered declaring that Quinn, Riche and Connor breached their fiduciary duty to Wilkes as a minority stockholder in Springside, and awarding money damages therefor. Wilkes shall be allowed to recover from Riche, the estate of T. Edward Quinn and the estate of Lawrence R. Connor, ratably, according to the inequitable enrichment of each, the salary he would have received had he remained an officer and director of Springside. In considering the issue of damages the judge on remand shall take into account the extent to which any remaining corporate funds of Springside may be diverted to satisfy Wilkes's claim.

*So ordered.*