## Dennis J. Solomon, et al. v. Atlantis Development, Inc., et al.

[516 A.2d 132]

No. 403-81

Present: **Hill, Underwood and Peck, JJ., and Barney, C.J. (Ret.), and Larrow, J. (Ret.), Specially Assigned**

Opinion Filed February 14, 1986

Motion for Reargument Denied September 11, 1986

*Dennis J. Solomon*, pro se, Martha's Vineyard, Massachusetts, Plaintiff-Appellant.

*Cheney & Brock, P.C.*, Montpelier, for Plaintiff-Appellant Meledones.

*Downs Rachlin & Martin*, Burlington, for Defendants-Appellees.

**Hill, J.** This is a derivative action brought by plaintiffs, Solomon and Meledones, on their own behalf as shareholders of Atlantis Development, Inc. (Atlantis). Plaintiffs' complaint alleged, in pertinent part, that defendants, Malloy and Mordecai, acted in concert to force the sale of the corporation's assets to defendant Malloy in breach of their fiduciary relationship to the plaintiffs and to the corporation. Plaintiffs prayed for rescissory damages and an accounting for lost profits. Defendant Malloy filed a counterclaim against plaintiff Solomon alleging defamation of character.

The case was tried without a jury. The court found that the sale of assets for inadequate consideration constituted constructive fraud, and it awarded each plaintiff shareholder damages in the amount of 25% of the value of the corporation at the time of sale, $25,000 for attorney's fees and $7,500 in costs. The court further found that Solomon maliciously slandered Malloy, and it awarded Malloy $2,500 in compensatory damages and $2,500 in punitive damages on defendant's counterclaim. Both parties appeal. Judgment on defendant's counterclaim is affirmed; judgment on plaintiffs' complaint is reversed; the award of attorneys fees and costs is vacated.

The trial court issued a detailed and factually complete set of findings which we summarize here. Atlantis was incorporated in Massachusetts on February 6, 1973. Plaintiffs Solomon and Meledones and defendant Mordecai each owned a one-third interest in the company. In 1974, the corporation moved its principal place of business to Waitsfield, Vermont.

Atlantis was engaged in the business of manufacturing and selling high quality marine foul weather gear. The cloth was manufactured by the Alb manufacturing company. Unfortunately, Atlantis had serious cash flow problems and in the early years of operation its principals were forced to look for outside sources of capital. Defendant Malloy was one such source. In May 1975, he agreed, in return for a 25% interest, to lend the corporation $50,000 and assist it in finding further financing as it required.

Despite this infusion of capital, Atlantis continued to experience financial problems. Sales were not sufficient to overcome its continuing losses, and Malloy was unable to find lenders willing to extend credit to the corporation. In October and November 1975, Malloy lent Atlantis an additional $45,000 in return for corporate promissory notes due January 31, 1976.

Although defendant Malloy initially did not plan to get involved in the day-to-day operations of the business, mismanagement forced him to take on a more active role. Eventually he took control of accounts payable as well as the financing negotiations with Alb.

In November 1975, the corporation concentrated on improving its sales program. The program, however, generated internal morale problems, and it did little to brighten Atlantis' immediate economic future. On December 10, 1975, notice was sent out that a meeting of stockholders was to be held on January 19, 1976. The notice stated that the meeting was being held to elect directors and to conduct any other corporate business.

Prior to this meeting, none of the principals knew of the true financial condition of the company. On January 18, 1976, defendants Malloy and Mordecai met to review the corporate records in preparation for the meeting. It was the first time that the records maintained in New York by Malloy and those maintained at the corporate headquarters in Vermont were brought together and made available for inspection by the officers and stockholders. Plaintiff Meledones was invited to the preview but declined to attend. It was at this preview to the stockholders' meeting that Malloy realized that financial statements drawn up at his request were erroneous and that the corporation actually had a larger deficit than the books indicated.

At the stockholders' meeting the following day, Malloy explained that the corporation was again in dire financial condition. Although Malloy was unable to compute the corporation's deficit

down to the dollar, there was no evidence of any attempt to conceal or misrepresent information. Discussion at the meeting centered around the deficit, the fact that substantial obligations would be due and payable shortly, and that substantial additional capital would be needed in order to keep the corporation afloat. The possibility of bankruptcy was entertained but rejected because creditors of the corporation, mostly friends and relatives of the three initial shareholders, would stand to lose most of their investment. The sale of additional stock was likewise considered and rejected. Finally, defendant Malloy was asked whether he would be willing to purchase the corporation's assets for $1 and assume its liabilities. This solution, it was recognized, would assure that creditors would be paid in full, and it would give Malloy the option of liquidating the corporation to salvage his investment or continue the business if he thought he could make it profitable.

Solomon asked for a ten-day postponement of the vote so that the principals could obtain a clearer picture of the company's finances. This proposal was rejected because of the difficulties associated with reconvening and because it was not felt that a substantial benefit would be gained by the delay. Prior to the vote, Malloy agreed that if any of the principals found a better offer from another buyer in the next ninety days he would return the assets to the corporation. The proposed sale was then put to a vote. Meledones, Mordecai and Malloy voted in favor of the proposal; Solomon voted against it. Thereupon, Malloy purchased the assets of the corporation for $1 and assumed its liabilities.

Malloy was twice contacted during the ninety-day period by persons interested in buying Atlantis. However, neither person pursued the matter after learning of Atlantis' liabilities.

Shortly after, executing the sale agreement, Malloy formed a new corporation, Atlantis Weathergear Inc. (Weathergear), of which he was the sole shareholder. In April, he offered to pay holders of debentures in the old corporation the face value of their notes plus interest; all accepted.

It was not until June or July that Malloy concluded that the business could be profitable. Thereafter, he acquired a majority interest in Alb and invested a great deal of time and money in Weathergear. Weathergear prospered.

## I.

■ Plaintiffs first challenge several of the trial court's findings of fact. According to V.R.C.P. 52(a), findings of fact set forth by a trial court, sitting without a jury, shall not be set aside unless they are clearly erroneous, and due regard shall be given to the trial court's opportunity to judge the credibility of the witnesses and the weight of the evidence. Thus, "[i]n evaluating a claim that findings below are not properly supported by the record, we will review the evidence in the light most favorable to the prevailing party, excluding the effect of any modifying evidence, and if we find any credible evidence fairly and reasonably tending to support them, the findings will stand." *Collins* v. *Boudreau,* 141 Vt. 129, 131, 446 A.2d 341, 342 (1982).

■ Upon review of the record, we find that there is credible evidence to support the court's finding that defendant Malloy satisfied his contractual obligations to Atlantis. Defendant Malloy's contract provided that he use his best efforts to acquire financing of no less than $50,000 and no more than the capitalization of the corporation would bear. The evidence showed that Malloy personally loaned the company $45,000 and obtained a letter of credit for $20,000 in the fall of 1975.

The evidence is more equivocal with respect to the court's finding that Weathergear was initially operated as if the business was to be liquidated. Nevertheless, we fail to see how this finding is relevant to any material fact in issue on appeal. Plaintiffs' proposed finding that Weathergear simply picked up where Atlantis left off is plainly without merit as it was not until after Malloy invested substantial additional sums of his own money and purchased a controlling interest in Weathergear's major supplier, Alb, that the corporation flourished.

## II.

Plaintiffs next assert that the procedure used to transfer the assets of Atlantis to defendant Malloy was fatally flawed and that the circumstances surrounding the sale conclusively prove fraud. We disagree.

■ Both parties agree that Massachusetts law governs the corporate transactions at issue here. Under Massachusetts law, the sale of all or substantially all corporate assets must be authorized at a shareholders' meeting duly called for that purpose by a

vote of two-thirds of the outstanding shares entitled to vote thereon. Mass. Gen. Laws Ann. ch. 156(B), § 75. Although the notice sent out to the shareholders was clearly deficient in that no mention was made of the possible sale of the corporation's assets, see Mass. Gen. Laws Ann. ch. 156(B), §§ 36 and 75, plaintiffs, by attending the meeting, participating in the discussion and voting on the proposed sale, waived their right to object. See generally 5 Fletcher Cyclopedia Corporations § 2011 (O. Smith ed. 1976).

Three of the four shareholders voted to approve the sale. Plaintiffs claim, however, that the vote should be invalidated because the defendant, by voting on the sale of assets, by using his position as creditor to force an immediate vote and by withholding information so as to misrepresent the financial condition of the corporation, breached his fiduciary relationship to the corporation.

We note first that the trial court found no evidence of any attempt by the defendants to deliberately conceal or misrepresent pertinent information. Moreover, the court found no evidence of any conspiracy between defendants to take over the corporation. The corporation's financial records were readily available to all and were, in fact, borrowed by plaintiff Meledones after the shareholders' meeting. Thus, the question reduces to whether the sale should be rescinded because defendant Malloy voted on the sale of assets to himself.

As a general rule, a director should refrain from voting on matters where a conflict is apparent. See, e.g., *American Discount Corp.* v. *Kaitz,* 348 Mass. 706, 711, 206 N.E.2d 156, 160 (1965) ("Where the director's duty of loyalty to the corporation is in conflict with his self-interest the court will vigorously scrutinize the situation."). The plaintiffs and defendants, however, voted as *stockholders* in approving the sale of the corporation's assets as is required by statute.

A stockholder is not automatically disqualified from voting on matters affecting his self-interest. See *Kentucky Package Store, Inc.* v. *Checani,* 331 Mass. 125, 117 N.E.2d 139 (1954) (court held that majority shareholder could not be precluded from voting her shares on question as to whether corporation should exercise its option to purchase her shares). As the court stated in *Checani, supra,* "[t]he holders of a minority stock interest cannot be permitted to restrain those holding a majority of the shares from ex-

ercising their rights to vote because their votes would be adverse to the views of the minority." *Id.* at 129, 117 N.E.2d at 141-42.

To be sure, according to Massachusetts law, "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *Donahue* v. *Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 593, 328 N.E.2d 505, 515 (1975) (footnotes omitted). The duty owed is one of " 'utmost good faith and loyalty.' " *Wilkes* v. *Springside Nursing Home, Inc.,* 370 Mass. 842, 848, 353 N.E.2d 657, 661 (1976) (citations omitted).

In *Wilkes, supra,* however, the Massachusetts court limited the strict good faith test enunciated in *Donahue* fearing that "untempered application" would restrict "legitimate action by the controlling group in a close corporation which [would] unduly hamper its effectiveness in managing the corporation in the best interests of all concerned." *Wilkes, supra,* 370 Mass. at 850, 353 N.E.2d at 663. Thus, the duty of loyalty and good faith is fulfilled if the controlling group [or interested stockholder] can "demonstrate a legitimate business purpose for its action." *Id.* at 851, 353 N.E.2d at 663. Once this burden is met, minority stockholders can still challenge the transaction by showing that the same objective could have been accomplished by an alternative less harmful to their interests. *Id.* at 851-52, 353 N.E.2d at 663.

■ At the time of the sale, Atlantis was undisputably in dire financial condition. It faced a deficit then estimated to be $30,000, promissory notes in the amount of $45,000 were due and payable on January 31, 1976, and the finances needed to continue operations were not seemingly available. The trial court found that various solutions, including bankruptcy and the sale of stock, were discussed and rejected and that, in this context, the sale of the corporation's assets was a legitimate and reasonable business decision. The evidence amply supports this finding.

Defendants claim on cross-appeal that in the absence of fraud or illegality the plaintiffs' exclusive remedy lay in their statutory right to an appraisal. Mass. Gen. Laws Ann. ch. 156(B), § 98.*

---

\* This statute provides:

> The enforcement by a stockholder of his right to receive payment for his shares in the manner provided in this chapter shall be an exclusive remedy except that this chapter shall not exclude the right of such stockholder to bring or maintain an appropriate proceeding to obtain relief on the ground that such corporate action will be or is illegal or fraudulent as to him.

The trial court, however, found that defendants' unseemly and ill-advised haste, coupled with the sale for inadequate consideration, constituted a breach of their fiduciary duties entitling the plaintiffs to remedies other than appraisal.

In *Pupecki v. James Madison Corp.*, 376 Mass. 212, 217, 382 N.E.2d 1030, 1033 (1978), cited by the trial court as support for its ruling, the Massachusetts Supreme Judicial Court held that a majority stockholder who "possessed the authority to cause the corporation to sell its assets . . . was also under a duty . . . to assure that the corporation received adequate consideration for them."

■ This case is clearly distinguishable; defendants here did not own a controlling interest in the corporation nor did they possess the authority to cause the corporation to sell its assets. The sale of assets to defendant Malloy was proposed by Mordecai, and it was approved by three of the four principal stockholders of the corporation. We fail to see how, under these circumstances, defendants breached their fiduciary duty to the plaintiff stockholders.

As we do not believe that the rationale underlying *Pupecki* is applicable here, we agree with the defendants and hold that plaintiffs' exclusive remedy under Massachusetts law lay in their statutory right to receive payment equal to the appraised value of their shares. In order to exercise this right, plaintiffs were required to (1) file written objection to the proposed action stating that they intended to demand payment for their shares, and (2) vote their shares against the proposed corporate action. Mass. Gen. Laws Ann. ch. 156(B), § 86. Neither plaintiff chose to pursue this avenue of relief. Consequently, they cannot now seek to invoke their appraisal rights.

## III.

■ Defendants have also cross-appealed the trial court's award of attorney fees and costs in the action. Under the general rule, attorney's fees are not ordinarily recoverable as costs. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391 (1970). Courts in many jurisdictions, including Vermont, however, have created an exception to this rule in stockholder derivative actions where the suit confers a benefit on the corporation rather than the plaintiff. See *Lash v. Lash Furniture Company of Barre, Inc.*, 130 Vt. 517,

524, 296 A.2d 207, 212 (1972). The case at bar was clearly intended to benefit the plaintiffs as shareholders, not the corporation. Thus, the court's award of fees and costs would have been inappropriate even if the plaintiffs had prevailed in the underlying action, and we vacate that portion of the court's judgment.

## IV.

We come finally to that part of plaintiff Solomon's appeal which challenges the trial court's award of punitive and compensatory damages on defendant Malloy's counterclaim for defamation of character. Plaintiff moved before trial to dismiss the charge for failure to allege the words claimed to be actionable, and he now claims that the court erred in denying plaintiff's motion. We disagree.

■ ■ Under V.R.C.P. 8(a) a pleader need only set forth "a short and plain statement of the claim" entitling him to relief. "A pleading is sufficient if it gives fair notice of the claim and the grounds upon which it rests." *Bressler* v. *Keller,* 139 Vt. 401, 403, 429 A.2d 1306, 1307 (1981). Although the defendant failed to plead the defamatory statements *in haec verba,* he fully informed the plaintiff of the nature and subject matter of the counterclaim. "[O]nce the [adverse party] has sufficient notice of the nature of the communications complained of it is the function of the jury rather than of rigidly applied pleading rules to ascribe weight to the inexactness of such complaints." *Pirre* v. *Printing Developments, Inc.,* 432 F. Supp. 840, 843 (S.D.N.Y. 1977). To the extent that there is case law contrary to our holding here, it is overruled.

Plaintiff Solomon's claim that the evidence is insufficient to support the trial court's finding on the defamation counterclaim is likewise without merit. "The gist of an action for [slander] is injury to the plaintiff's reputation." *Fin* v. *Middlebury College,* 136 Vt. 543, 544, 394 A.2d 1152, 1153 (1978). In order to prevail, the plaintiff must establish that the defamatory statement "tends to lower him in the estimation of a substantial respectable group . . . ." *Id.*

In the instant case, plaintiff Solomon called an investigative reporter and told him of a conversation he overheard concerning the defendant's involvement in the potato futures market. His statement, taken in context, clearly implied that the defendant Malloy was illegally manipulating the market.

Although slander involving imputation of a crime or statements injurious to one's trade or business is actionable per se, a claimant must show actual harm in order to recover general or compensatory damages. *Lent* v. *Huntoon,* 143 Vt. 539, 546-49, 470 A.2d 1162, 1168-69 (1983). Facts entitling one to punitive damages in an action for slander, on the other hand, must be alleged and proven. *Id.* at 549, 470 A.2d at 1170.

The lower court found that defendant Malloy suffered embarassment and temporary injury to reputation. This finding is supported by credible evidence, and the compensatory damage award is therefore upheld. The court further found that the plaintiff acted with malice, a finding which is amply supported on the record. Thus, the court's punitive damage award must also stand. See *Lent, supra,* 143 Vt. at 551, 470 A.2d at 1171 (showing of malice required to support award of punitive damages in defamation suit).

*Judgment on defendant's counterclaim is affirmed; judgment on plaintiffs' complaint is reversed; award of fees is vacated. Costs to be taxed in accordance with V.R.A.P. 39.*