Gants, Ralph D., J.
The plaintiff Peter Massmanian (“Massmanian”) is a 30 percent shareholder in a closely held corporation, North/Win, Ltd. (“North/Win”), which manufactures and packages windshield washer fluid. The defendants William Du-Bose and his brother, Blaine DuBose (“the DuBoses”), together hold a controlling interest in North/Win and the related defendant companies:
South/Win, Ltd. (“South/Win") and West/Win, Ltd. (“West/Win”), which also manufacture and package windshield washer fluid;
Enoco, Ltd. (“Enoco”), which supplies methanol, an essential ingredient in windshield washer fluid, to North/Win; and
DuBose Company, LLC (“DuBose Company”), which leases manufacturing and packaging equipment to North/Win.[1]
In essence, Massmanian alleges that the DuBoses, through various means, have wrongfully diverted North/Win’s assets and profits to the other entities they control, in which they hold greater than a 70 percent controlling interest, in breach of the fiduciary duty they owe to North/Win and to him as a minority shareholder. Massmanian also alleges that North/Win’s accountant, defendant Robert Fairey and his firm, Robinson and Fairey CPA, P.C. (collectively, “Fairey”), wrongfully assisted the DuBoses in this breach of their fiduciary duty.
After this lawsuit was filed, on September 6, 2005, North/Win fired Massmanian for cause, contending inter alia that he had neglected his duties, “engaged in continued acts of insubordination,” and breached his Employment Agreement. Under that Employment Agreement, executed in February 2003, Massmanian is entitled to lifetime employment at North/Win unless he resigns, becomes permanently disabled, or is terminated for cause. (Employment Agreement at §4.) “Termination for cause” is defined in the Agreement to mean:
termination of the employment of the Employee by the Company for or as a result of (1) misappropriation of funds, embezzlement, theft, or fraud by the Employee from or against the Company, or from or against any parent, affiliate or subsidiary of the Company; (2) a conviction, guilty plea or plea of nolo contendere by the Employee for any felony involving moral turpitude; (3) continued neglect of duties for which employed or continued acts of insubordination by the Employee; (4) sexual harassment or other discrimination in violation of state or federal law by the Employee in connection with his employment; or (5) any breach by the Employee of this Agreement.
Massmanian’s termination not only affects his entitlement to lifetime employment, but also triggers the Optional Redemption Right in North/Win’s Stock Purchase Agreement with Massmanian, also executed in February 2003. Pursuant to that Optional Redemption Right, once Massmanian’s employment with North/Win is terminated for any reason, North/Win has the right within 90 days to exercise its option to purchase Massmanian’s shares in North/Win for the Buy-Out Price, defined in the Agreement as the value of his shares as of the date of termination, to be determined by an independent and qualified appraiser. If North/Win does not exercise its Optional Redemption Right, Massmanian can exercise within 120 days of his termination his Optional Put Right to sell his shares at the Buy-Out Price.
Massmanian has moved for a preliminary injunction to enjoin North/Win’s termination of his employment and the triggering of North/Win’s Optional Redemption Right. He also seeks an order enjoining the defendants from preventing his unfettered access to North/Win records. Finally, he seeks an order barring the DuBose Defendants from paying their collective legal defense fees from North/Win funds and from otherwise diverting North/Win monies to the other DuBose entities except in the ordinary course of business.
*63 The Standard for a Preliminary Injunction
In determining whether to grant a preliminary injunction, this Court must perform the three-part balancing test articulated in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 & n.ll. Third, “(i]f the judge is convinced that failure to issue the injunction would subject the moving pariy to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing pariy.” Id. at 617. In balancing these factors, “[w]hat matters as to each pariy is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving pariy may a preliminary injunction properly issue.” Id. In an appropriate case, like this, “the risk of harm to the public interest also may be considered.” Brookline v. Goldstein, 388 Mass. 443, 447 (1983). This Court will consider each of these factors in turn.
1. Massmanian’s Likelihood of Success
North/Win, in essence, contends that its termination of Massmanian for cause was justified because he:
was insubordinate to Ted Humphrey (North/Win’s Chief Financial Officer), Will DuBose (North/Win’s President, a member of its Board of Directors, and a defendant in this litigation), and Blaine DuBose (a member of North/Win’s Board of Directors and a defendant in this litigation):
disrupted North/Win’s business by communicating with employees from North/Win, South/Win, and West/Win about his grievances with management;
refused to “build” or “package” product for Walmart, StarBrite, and other customers without a valid purchase order and a shipping date, contrary to Will DuBose’s instructions; and
postponed until November 2005 the purchase of product from West/Win that he claimed North/Win did not now need or have the space for, contrary to Will DuBose’s instructions.
Massmanian denies that his termination for cause was justified. He contends that, during the peak season, he worked 12-15 hours a day during the week, and 7-8 hours a day on the weekend. During the summer off-season, he works 8 hour days. He attests that, as General Manager and Vice President of Operations of North/Win, he was instrumental in generating revenues of roughly $12,500,000 and profits of $1,250,000 in fiscal year 2004. In fiscal year 2005 to date, overall revenue has increased by 10 percent and, as of August 31, 2005, North/Win posted a $700,000 profit, which he contends is notable because that profit was earned despite the legal fees that have been assessed by the defendants in their entirely against North/Win in this litigation and the diversion of funds from North/Win to the other DuBose entities that he has alleged in his complaint. As to the particular allegations lodged against him by North/Win, Massmanian attests that:
Although North/Win did not need the two truckloads of ICE O Diy gas line antifreeze that Will DuBose ordered him to purchase from West/Win in May 2005 and although Massmanian informed Du-Bose that storing excessive amounts of this flammable product in the summer was not advisable, he ultimately informed DuBose that he would issue a purchase order for this product as a result of DuBose’s direct order.
It was not conventional practice to package product for Walmart, StarBrite, or other customers without a purchase order, but Massmanian ultimately did follow Will DuBose’s instructions to place these product orders without a purchase order.
He complained to the accounting department that they had inappropriately recorded the cost of Dow Chemical raw materials to reflect a $.09 per unit rebate when that rebate would be received only if the DuBose Defendants purchased 10 million pounds of these raw materials from Dow Chemical, which they had not yet done. Massmanian believed that this premature entry of a rebate falsely inflated profits at North/Win.
He has repeatedly reported to Will DuBose since December 2004 that windshield washer product packaged by South/Win was defective and posed a potential safety risk, but DuBose has refused to recall the product.
He refused to follow DuBose’s instructions to follow a price sheet that arose from a price fixing scheme that DuBose had made with North/Win’s competitor, StarBrite, because he did not consider such a scheme to be lawful;
DuBose instructed South/Win’s employees not to send Massmanian the information he needed to file required EPA reports for North/Win regarding the toxic chemicals used in the manufacture of its product. That information was received only after he contacted North/Win’s corporate counsel and the EPA representative in Boston.
He reported to corporate counsel the information set forth above regarding Will DuBose’s conduct because he believed the conduct to be unlawful.
Based on the affidavits submitted at or prior to the two preliminary injunction hearings, this Court concludes preliminarily that Massmanian is veiy likely to *64 prevail in proving that North/Win did not have cause for his termination, and that his termination breached his Employment Agreement. This Court also concludes that Massmanian is very likely to prevail in proving that the DuBoses have improperly diverted North/Win funds to other DuBose entities for the purpose of diminishing the value of Massmanian’s 30 percent interest in North/Win. Many of Massmanian’s critical assertions and defenses are supported by contemporaneous documentation and this Court finds them credible. The evidence presented by the DuBose defendants is far less credible and the documentation they have proffered does not meaningfully support their assertions and defenses. All too often, attestations offered by the DuBose defendants have been shown either to be false or a mis characterization of the truth.
Moreover, in evaluating the likelihood that Massmanian will prevail, this Court notes that, one day after Massmanian’s termination, North/Win ordered its employees to sign an overreaching Confi- . dentiality Agreement as a condition of their continued employment whose only apparent purpose was to prevent these employees from disclosing to Massmanian what was happening at North/Win. One employee, the plant manager, was terminated for refusing to sign. This Confidentiality Agreement defines confidential information in a rather extraordinary way — it declares confidential “compliance with applicable rules and regulations” and “matters relating to the lawsuit which Peter Massmanian has filed against the Company.” It bars the employee from disclosing this confidential information, even in a legal proceeding, unless “specifically ordered to do so by a court of law.” In short, it would bar any employee from speaking to a regulatoiy or law enforcement agency about any violations of law being committed at North/Win and would bar them even from answering questions at a deposition in this case unless the Court specifically ordered them to answer.[2] A factfinder who learns of this heavy-handed overreaching by North/Win is likely to conclude that North/Win is scared stiff about the information its employees may possess, and is attempting to prevent the disclosure of this information to regulatory and law enforcement authorities and to plaintiffs counsel. If a factfinder had any question as to whether Massmanian’s allegations in the bullets above were fair and accurate, those doubts are likely to evaporate when that factfinder considers the steps that North/Win was prepared to take to hide this information. In sum, this Court finds that Massmanian is very likely to prevail at trial both in proving that there was not cause for his termination under the Employment Agreement and that the DuBoses have been improperly diverting monies from North/Win in breach of their fiduciary duty to him as a minority shareholder.
2. Irreparable Injury
If this were simply an employment case resolving whether a corporation had properly terminated its general manager with cause, there would almost certainly not be a showing of irreparable injury sufficient to support a preliminary injunction of the type sought. The loss of income resulting from a termination of employment, no matter how painful, is classically a wrong that can be remedied with money damages and is not the stuff of irreparable injury. See generally Sampson v. Murray, 415 U.S. 61, 90-92 (1974). However, the Supreme Court in Sampson, when considering the wrongful dismissal of a federal employee, recognized “that cases may arise in which the circumstances surrounding an employee’s discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found.” Id. at 92 n.68.
In North Carolina, as in Massachusetts, “majority shareholders in a close corporation owe a ‘special duty’ and obligation of good faith to minority shareholders.” Norman v. Nash Johnson & Sons Farms, Inc., 140 N.C.App. 390, 407, 537 S.E.2d 248 (2000). See generally Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 528-29 (1997) (“In the case of a close corporation, which resembles a partnership, duties of loyally extend to shareholders, who owe one another substantially the same duty of utmost good faith and loyalty in the operation of the enterprise that partners owe to one another, a duty that is even stricter than that required of directors and shareholders in corporations generally”). The Massachusetts Supreme Judicial Court has recognized that “one peculiar aspect of close corporations was the opportunity afforded to majority stockholders to oppress, disadvantage or ‘freeze out’ minority stockholders.” Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 849 (1976), citing Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578 (1975). The Court, after discussing how a “freeze out” can be accomplished by refusing to allow minority shareholders to sell their shares to the corporation at the same price available to the majority, noted:
“Freeze outs,” however, may be accomplished by the use of other devices. One such device which has proved to be particularly effective in accomplishing the purpose of the majority is to deprive minority stockholders of corporate offices and of employment with the corporation. F.H. O’Neal, “Squeeze-Outs” of Minority Shareholders 59, 78-79 (1975) ... This “freeze-out” technique has been successful because courts fairly consistently have been disinclined to interfere in those facets of internal corporate operations, such as the selection and retention or dismissal of officers, directors and employees, which essentially involve management decisions subject to the principle of majority control. See Note, 35 N.C.L.Rev. 271,277 (1957). As one author *65 itative source has said, “(M]any courts apparently feel that there is a legitimate sphere in which the controlling (directors or) shareholders can act in their own interest even if the minority suffers.” F.H. O’Neal, supra at 59 (footnote omitted). Comment, 1959 Duke L.J. 436, 437.
The denial of employment to the minority at the hands of the majority is especially pernicious in some instances. A guaranty of employment with the corporation may have been one of the “basic reasons) why a minority owner has invested capital in the firm.” Symposium-The Close Corporation, 52 Nw.U.L.Rev. 345, 392 (1957). See F.H. O’Neal, supra at 78-79; Hancock, Minority Interests in Small Business Entities, 17 Clev.Mar.L.Rev. 130, 132-133 (1968); 89 Harv.L.Rev. 423, 427 (1975). The minority stockholder typically depends on his salary as the principal return on his investment, since the “earnings of a close corporation . . . are distributed in major part in salaries, bonuses and retirement benefits.” 1 F.H. O’Neal, Close Corporations s 1.07 (1971). Other noneconomic interests of the minority stockholder are likewise injuriously affected by barring him from corporate office. See F.H. O’Neal, “Squeeze-Outs” of Minority Shareholders 79 (1975). Such action severely restricts his participation in the management of the enterprise, and he is relegated to enjoying those benefits incident to his status as a stockholder. See Symposium-The Close Corporation, 52 Nw.U.L.Rev. 345, 386 (1957). In sum, by terminating a minority stockholder’s employment or by severing him from a position as an officer or director, the majority effectively frustrate the minority stockholder’s purposes in entering on the corporate venture and also deny him an equal return on his investment.
Wilkes at 849-50. See also Merola v. Exergen Corp., 423 Mass. 461, 464-65 (1996) (“The termination of a minority shareholder’s employment may present a situation where the majority interest has breached its fiduciary duty to the minority interest”).
Here, Massmanian’s termination by North/Win is essentially a triple freeze-out of him as a minority shareholder: (1) it denies him the lifetime entitlement to employment that was an important benefit of his minority shareholder status; (2) it triggers North/Win’s Optional Redemption Right that, if exercised by North/Win, requires Massmanian to sell his 30% interest at the appraisal price; and (3) by removing him from the corporation, it denies him access to the information that he would need to protect his minority interest from being diminished by the diversion of corporate assets and other breaches of the majority shareholders’ fiduciary duty to him. If there were no employment agreement with Massmanian, the controlling group of North/Win could have terminated him as General Manager and Vice President of Operations in accordance with the fiduciary duty owed to him only by demonstrating “a legitimate business purpose for its action.” Id. at 851. Here, where there is an employment agreement, the controlling group of shareholders must not only show a legitimate business purpose but also cause for his termination. This Court finds preliminarily that the jury will likely find neither.
While Massmanian would not suffer irreparable injury simply from his loss of income arising from the termination of his employment, he certainly does risk irreparable injury from two other sources: (1) the exercise by North/Win of its Optional Redemption Right, which would deprive him of his minority interest in North/Win, and (2) the denial of access to the operations of North/Win and to his fellow employees, which renders him unable to guard against the diversion of corporate monies and other acts by the control group of shareholders that would diminish the value of his minority interest. The first risk of irreparable injury could be alleviated by enjoining the exercise of North/Win’s redemption right. The second risk, in most cases, can reasonably be alleviated through routine civil discovery and by granting the terminated minority shareholder access to all corporate books. That remedy, however, is not likely to be sufficient here, because, as demonstrated by its attempt to silence the other North/Win employees after terminating Massmanian, North/Win appears to be willing to take extraordinary (and indeed improper) steps to deny Massmanian and his attorneys information as to what is happening at North/Win in his absence. The extraordinarily heavy-handed attempt by North/Win to silence its employees through the misuse of a Confidentiality Agreement warrants the unusual remedy by this Court of a preliminary injunction that bars North/Win from terminating Massmanian’s employment pending final adjudication of his breach of contract and breach of fiduciary claims or further order of the Court. See Haley v. Forcelle, 669 N.W.2d 48, 57 (Minn.Ct.App. 2003) (injunctive relief reinstating employment may be warranted where a minority shareholder and employee can demonstrate irreparable harm in not only the “loss of the ability to work for his company and earn a living, but also .. . the loss of the ability to have a voice in management and to protect . . . his interests in the company”).
North/Win’s belated attempt to undo these provisions once the true nature of the Confidentiality Agreement was revealed to the Court does not change this Court’s belief in the likelihood of irreparable injury if Massmanian is terminated. This Court finds little solace in learning that, after North/Win compelled its employees to sign an improper Confidentiality Agreement and fired at least one employee for refusing to do so, and after misrepresenting to the Court the content of that Agreement, it was willing to modify the Agreement to eliminate its plainly illegal elements after it learned at the hearing that the Court was troubled by *66 the implications of certain provision of the agreement (which the Court had not yet been shown). Moreover, even this belatedly revised Agreement still bars any current North/Win employee from saying anything to Massmanian as to what is happening at North/Win except at deposition or trial. If anything, the feebleness of North/Win’s belated remedy of its wrong strengthens this Court’s belief that North/Win still wishes to silence its employees and keep Massmanian and his counsel from learning what is happening at North/Win in his absence.
There is another separate and distinct risk of irreparable injuiy that Massmanian is likely to suffer if he does not return as North/Win’s General Manager — if he is not there, there is a significant risk that the DuBoses will accelerate the improper diversion of North/Win’s assets they have already commenced, leave North/Win effectively unable to do business, and substantially diminish the value of Massmanian’s minorify interest. Already, this Court finds it likely that Massmanian will prevail in proving the illegal diversion of assets. The combination of his sudden termination, followed by North/Win’s direction to the other employees that, on pain of termination, they sign a Confidentiality Agreement that effectively bars them from communicating with Massmanian about what is happening at North/Win, causes this Court to believe that the DuBoses’ intention was to accelerate the improper diversion of funds, deplete the fair value of the company, invoke the Optional Redemption Right, and then purchase Massmanian’s shares for the lower appraised value. Without this unusual preliminary injunction, this Court fears that the law will not successfully prevent the DuBoses from accomplishing this breach of fiduciary duty.[3]
3. The Balance of Irreparable Harm
This Court is acutely aware that a preliminary injunction barring North/Win from terminating Massmanian’s employment pending final adjudication (or further order of the Court if there were to be a change in circumstances) risks irreparable injury to the DuBoses, as the majority shareholders of North/Win, who will be forced to retain a General Manager they have declared neglectful and insubordinate to operate their business in Massachusetts. This Court finds that this risk of irreparable harm to the DuBoses is far outweighed by the risk of irreparable harm to Massmanian. The preliminary injunctive record demonstrates that North/Win’s revenues have continued to grow and its profits have remained healthy with Massmanian as General Manager, even with this lawsuit pending and even with significant sums of corporate monies being diverted to the other DuBose corporations. In fact, North/Win has been the most profitable of the DuBose corporations since fiscal year 2003. There is nothing in the record to indicate that North/Win’s revenues and profits are likely to grow greater without Massmanian. Indeed, the record strongly suggests that North/Win’s performance will significantly deteriorate without Massmanian remaining as General Manager.
For these reasons, this Court, having considered the relevant factors and balanced them, concludes that justice requires the allowance of Massmanian’s motion to enjoin North/Win from terminating Massmanian’s employment.
This Court has also considered the supplemental relief that Massmanian added to his motion on September 22 — an order barring the DuBose Defendants from paying their collective legal defense fees from North/Win funds and from otherwise diverting North/Win monies to the other DuBose entities except in the ordinary course of business. As has been noted, this Court finds that Massmanian is very likely to prevail at trial in proving that the DuBoses have been wrongfully diverting funds from North/Win to the other DuBose entities. This Court also finds that the DuBose Defendants’ counsel has admitted that, to date, 100 percent of the legal fees and expenses received from the DuBose Defendants have been paid by North/Win. This Court finds that this, too, will likely be found to constitute a wrongful diversion of North/Win funds. Having so found, this Court shall still deny Massmanian the supplemental injunctive relief he seeks because it finds that (1) the injury caused by these wrongful diversions of corporate funds is not irreparable, since it can be remedied by money damages, and (2) that the preliminary injunction barring North/Win from terminating Massmanian’s employment will allow this Court quickly to learn of any accelerated diversion of corporate funds by the DuBoses that may render North/Win effectively unable to compete in its market.
ORDER
For the reasons stated above, this Court ORDERS that the Plaintiffs Motion for Preliminary Injunction is ALLOWED in that, pending final adjudication of this case or further order of the Court:
1. North/Win is enjoined from terminating Massmanian’s employment as General Manager;
2. North/Win is enjoined from exercising the Optional Redemption Right in the Employment Agreement;
3. Regardless of any Confidentialiiy Agreement executed by any North/Win employee, all North/Win employees, past or present, are ordered to answer all relevant, unprivileged questions asked of them in a deposition in this action; and
4. North/Win is enjoined from interfering with Massmanian’s access to North/Win records.
This Court also ORDERS that Plaintiffs Supplemental Motion for a Preliminary Injunction, seeking an order barring the DuBose Defendants from paying their collective legal defense fees from North/Win funds and from otherwise diverting North/Win monies *67 to the other DuBose entities except in the ordinary course of business, is DENIED.
Plaintiffs motion for attorneys fees is also DENIED.

 When appropriate, the DuBoses and the entities they control will be referred to collectively as the DuBose Defendants.

 At the first preliminary injunction hearing, before this Court learned of the content of the Confidentiality Agreement, it specifically asked North/Win’s counsel whether it would prohibit employees from reporting health or safety violations to others outside the corporation. Counsel falsely stated that it did not. This Court makes no finding now as to whether that false statement was made with knowledge of its falsity. After the Confidentiality Agreement was furnished to the Court, North/Win’s counsel attested that the Agreement has since been modified to make clear that the Agreement does not prevent an employee from “(1) communicating with a government agency concerning matters of public health or safety or any violation of law which [he or she] believels] in good faith may have occurred at North/Win; and (2) testifying in a legal proceeding at a deposition or trial.” Although counsel’s affidavit fails to note it, the Agreement was also changed to eliminate the language that bars the employee from only disclosing information “in a legal proceeding if specifically ordered to do so by a court of law.” The revised Agreement, however, continues to include within the definition of confidential information any information regarding compliance with applicable rules and regulations, and “matters relating to the lawsuit which Peter Massmanian has filed against the Company.”

 The DuBose Defendants contend that the Appeals Court case of DeMoulas v. Demoulas Super Markets, Inc., 33 Mass.App.Ct. 939 (1992) (rescript), demonstrates that a court may not under any circumstances order a minority shareholder to be returned to his position in a closely-held corporation. This Court does not believe this case supports that proposition. That case posed entirely different circumstances from those present here, and the relief ordered by the single justice was fashioned in light of those circumstances. The Appeals Court did not declare that the relief sought here is never an appropriate exercise of the court’s authority or discretion to accomplish equity.