MARY M. BRODIE, executrix,[1] vs. ROBERT J. JORDAN
& another.[2]

No. 04-P-1572.

Middlesex. November 3, 2005. - May 31, 2006.

Present: DUFFLY, CYPHER, & KANTROWITZ, JJ.

Further appellate review granted, 447 Mass. 1107 (2006).

*Corporation,* Close corporation, Stockholder, Valuation. *Damages,* Breach of
fiduciary duty. *Jurisdiction,* Equitable. *Interest.*

The actions of the majority shareholders of a close corporation in barring the
plaintiff minority shareholder from corporate office, denying her requests
for the corporation's financial and operational information, and frustrating
her attempt to sell her shares to the corporation by refusing to complete in
good faith a determination of the value of her shares, constituted a freeze-
out of the plaintiff in breach of the majority shareholders' fiduciary duty
toward the plaintiff. [375-384]

In the circumstances of a civil action alleging that the defendants (majority
shareholders of a close corporation) breached their fiduciary duty to the
plaintiff (a minority shareholder) by freezing her out of the corporation,
the trial judge's order requiring the defendants to purchase the plaintiff's
shares at a price to be agreed upon by the parties in accordance with a
court-appointed expert's testimony was an appropriate remedy. [384-386]
KANTROWITZ, J., concurring in part and dissenting in part.

A trial judge correctly applied prejudgment interest pursuant to G. L. c. 231,
§ 6B, to a judgment in an action for breach of fiduciary duty brought by a
minority shareholder against the majority shareholders of a close
corporation. [386]

This court declined to address on appeal a substantive issue on which the
plaintiff offered no meaningful argument. [387]

CIVIL ACTION commenced in the Superior Court Department on
February 4, 1998.

The case was heard by *Elizabeth M. Fahey,* J.

*Dennis E. McKenna* for the defendants.

---

[1]Of the estate of Walter S. Brodie.

[2]David J. Barbuto. Jordan and Barbuto are each one-third shareholders, as
well as officers, of Malden Centerless Grinding, Inc. (Malden). See note 4,
*infra.*

*Michael B. Roitman* for the plaintiff.

CYPHER, J. This case requires us to assess whether a Superior Court judge properly determined, under the principles stated in *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. 578 (1975), that the plaintiff, Mary M. Brodie, was "frozen out" of Malden Centerless Grinding, Inc. (Malden), a close corporation, and that the defendants were in breach of their fiduciary duty to her; and whether she was entitled, as a remedy, to have the defendants purchase the 400 shares of capital stock which she held.

*Background.* We summarize the essential history from the judge's comprehensive findings following a jury-waived trial and supplemented where necessary with undisputed facts from the record.

Walter S. Brodie (the plaintiff's husband), David J. Barbuto, and Guy J. Agri organized Malden in 1973 as a G. L. c. 156B business corporation[3] to produce round metal objects, such as ball bearings. Agri, who was president, resigned in 1979, and Malden purchased the shares of stock he had held. Walter Brodie then became president. Walter Brodie and Barbuto remained the only two officers and shareholders until Robert J. Jordan, who had been hired in 1975, became a stockholder in 1984.[4] At that time, Jordan assumed responsibility for day to day operations.

Subsequently, Walter Brodie became inactive in Malden's daily activities. In 1989, he proposed that Malden purchase his shares for $145,000, and presented a draft purchase agreement. At the same time, he also proposed that on the death of a shareholder, Malden would purchase those shares with proceeds of the "key man" life insurance policy Malden had purchased (the buy-sell agreement). Jordan tore up the letter and told Walter Brodie that there was no point in pursuing it. Walter Brodie made repeated requests to Jordan that Malden buy his shares. Eventually, Jordan refused to consider those requests.

---

[3]Because G. L. c. 156D, added by St. 2003, c. 127, § 17, is applicable, through St. 2003, c. 127, § 22, to corporations which were established before July 1, 2004, and which were subject to G. L. c. 156B on June 30, 2004, we will refer in this decision to G. L. c. 156D.

[4]Walter Brodie, Barbuto, and Jordan each became the owner of 400 shares of the stock issued by Malden.

Other points of friction developed between Walter Brodie and Jordan, culminating in the removal of Walter Brodie as a director at a special meeting held in October, 1992. Although he received notices of annual meetings for the years 1993 to 1997, Walter Brodie did not attend those meetings. However, he did meet with Jordan and Barbuto two or three times each year.

Walter Brodie died in March, 1997. After his death, the plaintiff was appointed executrix of his estate in June, 1997, and also became the owner of the 400 shares of stock he had held in Malden. She sought a special meeting of Malden. The meeting was held in July, 1997, at which time her bid for election to the position of director, vacant since Walter Brodie's ouster in 1992, was defeated. At the special meeting, the plaintiff also sought information on Malden's financial condition and asked for an audit, and a determination of the value of the shares she held. After the meeting, Jordan responded to the plaintiff's requests in a letter dated August 21, 1997, essentially declining those requests and suggesting that if the plaintiff was interested in offering Malden her shares for purchase, she should follow the relevant provisions written in Malden's articles of organization. Those provisions provided that Malden be offered the shares before a third party became involved and set forth procedures for determining the share price (stock transfer restriction).

Having made little headway in obtaining the information she sought, the plaintiff filed a four-count complaint in the Superior Court on February 4, 1998, principally claiming that the defendants were in breach of their fiduciary duty to her and that she had been frozen out of the corporation. She sought unspecified monetary damages and other relief.

On October 29, 1998, the plaintiff gave notice, in accordance with Malden's articles of organization, that she wished to sell her shares for $205,000. Further steps were taken to comply with the required procedures, but that process was not completed because the parties began mediation in the Superior Court. Mediation as well did not result in a buy out. By a letter, dated August 27, 1999, the plaintiff was notified that Malden waived the stock transfer restriction and that Malden gave its consent for the plaintiff to dispose of her shares in "such manner as [she] may deem appropriate."

Soon thereafter, the parties defined the issues for trial in a pretrial memorandum filed on September 10, 1999. The case was tried in May, 2002. By that time, the plaintiff's complaint was reduced[5] to a single count alleging that she had been frozen out of Malden and that the defendants were in breach of their fiduciary duty to her. Complaining that the defendants first agreed, then refused, to participate in the valuation of her shares, she sought an equitable order that the defendants purchase her shares as relief for the alleged freeze-out.

The judge ruled that the defendants were in breach of their fiduciary duty to the plaintiff and that the plaintiff was entitled to relief. The judge fashioned that relief under the court's equitable power and ordered that the defendants purchase the plaintiff's shares at a price to be agreed upon by the parties. When the parties failed to reach an agreement, the question of valuation was submitted to the judge by the plaintiff by a motion to amend the judge's prior decision. The judge ordered judgment for the plaintiff based on a valuation of $94,500, which had been determined at trial, largely on the basis of the court-appointed expert's opinion[6]; applied prejudgment interest to that amount; and awarded certain injunctive relief. The defendants' appeal followed.

*Discussion.* The defendants claim that (1) the plaintiff was not frozen out of the corporation; (2) the order requiring the defendants to purchase the plaintiff's shares provides her with a windfall and punishes Malden; (3) the award of prejudgment interest was erroneous; and (4) the permanent injunction was an improper exercise of the Superior Court's equity power.[7] We

[5]The plaintiff's complaint contains counts for (I) breach of fiduciary duty; (II) breach of contract; (III) unjust enrichment; and (IV) a request for an accounting. Counts II and III, which are against Malden, were dismissed in January, 2000, by stipulation. The original complaint names James J. Russo, Jr., as a defendant. He was dismissed by stipulation in August, 2001. At the beginning of the trial, Malden was eliminated as a party in the case when the plaintiff dismissed count IV.

[6]The defendants do not challenge the value of the plaintiff's shares.

[7]The injunction restrained Barbuto from transferring the property he rents to Malden, restrained Jordan from transferring his home, and restrained Barbuto and Jordan from selling, transferring, assigning, or pledging the securities held by Malden.

review the judge's decision under well-established standards applicable to civil cases heard by a judge without a jury.

> "We accept the judge's findings of fact as true unless clearly erroneous . . . . As to matters of law, however, 'we scrutinize without deference the legal standard which the judge applied to the facts,' and "the 'clearly erroneous' standard of appellate review does not protect findings of fact or conclusions based upon incorrect legal standards.' *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. [789, 792 (1986)] . . . We set aside a judge's ultimate conclusion if we find it either 'clearly erroneous or inconsistent with the relevant legal standard.' *Johnson* v. *Modern Continental Constr. Co.*, 49 Mass. App. Ct. 545, 547 (2000)."

*Yankee Microwave, Inc.* v. *Petricca Communications Sys., Inc.*, 53 Mass. App. Ct. 497, 504 (2002).

1. *Freeze-out.* There is no dispute that Malden has the typical characteristics of a close corporation and falls within the well-settled principles of law applicable to the conduct between stockholders in such an entity. While there is no precise definition, a close corporation may be characterized as one where there are few stockholders, there is participation by majority stockholders in its management and direction, and there is no "ready market" for its stock. *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 586. "[S]tockholders . . . in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise . . . that partners owe to one another. . . . [That is the duty of the] 'utmost good faith and loyalty.' " *Id.* at 593, quoting from *Cardullo* v. *Landau*, 329 Mass. 5, 9 (1952). "A claim based on this duty is an equitable claim against individual stockholders." *Merola* v. *Exergen Corp.*, 423 Mass. 461, 464 (1996).

Although the close corporate form has many advantages for the stockholders, "it also supplies an opportunity for the majority stockholders to oppress or disadvantage minority stockholders. The minority is vulnerable to a variety of oppressive devices, termed 'freeze-outs,' which the majority may employ." *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 588. Typical majority actions constituting a freeze-out include deny-

ing a minority a corporate office or employment, refusing to declare dividends, treating the value of the minority's shares in an unequal manner, and excluding or isolating a minority shareholder from information, operations, and decision-making. See generally Southgate & Glazer, Corporation Law & Practice § 16.4[b] (Supp. 1998, 2004).

The judge concluded that there was "[a]mple evidence . . . presented at trial to support a conclusion that [the] defendants . . . engage[d] in a pattern of conduct that constituted a 'freeze-out' of [the plaintiff] in violation of the defendants' fiduciary duty." The evidence the judge considered was (a) the defendants' conduct toward the plaintiff at the special meeting, (b) their response to her requests for financial and operating information, and (c) their treatment of her request for valuation and purchase of her shares of stock. A review of the evidence reveals that the judge's conclusion was sound.

a. *The special meeting.* The plaintiff timely sought to exercise her rights as a shareholder after her husband's death. In a letter dated June 27, 1997, she asked for a special meeting of Malden. This request followed three prior requests for information, beginning in early May, 1997. It appears that Malden held its annual meeting on March 1, 1997, prior to Walter Brodie's death that month. The special meeting was held on July 22, 1997. The plaintiff, represented by counsel, attended and acted through a proxy, William E. Tarr.[8] Tarr nominated the plaintiff for the position of director, which had been vacant since Walter Brodie's ouster in 1992. The defendants voted against her, and each voted for the other. As a result, no director was elected because none received the unanimous vote of the shareholders required by Malden's by-laws. Without the election of successors, the defendants continued to serve as the directors.[9]

The defendants mistakenly assert that, because the plaintiff was not an employee and never sought employment with Malden,

---

[8]Tarr, a public accountant, had performed accounting services for Malden for some time during Walter Brodie's tenure as president. He was terminated by Jordan in 1991 and replaced by James Russo.

[9]At the times relevant in this case, Jordan served as a director and as the president and the clerk of Malden. Barbuto served as a director and as the treasurer.

the judge misapplied the law of *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 851-853 (1976). The plaintiff did not seek employment with Malden, but rather a corporate office. One of the "oppressive devices" which the majority may employ in effecting a freeze-out is to "deprive minority shareholders of corporate offices." *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 588-589, quoting from F. H. O'Neal & J. Derwin, Expulsion or Oppression of Business Associates, 42 (1961).

The judge did not believe the testimony of the defendants that the meeting became a "melee" and "broke out into chaos . . . and consequently nothing got accomplished." The minutes of the meeting do not indicate that any disruptive events occurred during the meeting. "There was no showing of misconduct on [the plaintiff's] part . . . which would lead us to approve the majority action as a legitimate response to the disruptive nature of an undesirable individual bent on injuring or destroying the corporation." *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. at 852.

The defendants assert that they cannot be seen to have violated their fiduciary duty by simply "voting [for their] choice." The defendants claim there was no evidence that the plaintiff had any relevant experience or business acumen. At trial, Jordan stated that he "didn't feel [the plaintiff] was adequate," but acknowledged that, in a deposition, he had said he and Barbuto voted against the plaintiff because "we chose to" and that there was no other reason. Neither Malden's articles of organization nor its by-laws states any requirements or qualifications for directors or officers.[10] "Those who become members of [a] corporation are entitled to assume that faith will be kept with them in observance of the by-laws and to resist infractions of them, and to enforce their rights accordingly." *Bushway Ice Cream Co.* v. *Fred H. Bean Co.*, 284 Mass. 239, 245 (1933).

The defendants' lack of valid reasons for voting down the plaintiff's nomination further "demonstrate[s] the identity of

---

[10]General Laws c. 156D, § 8.02, suggests that a corporation may impose qualifications for directors, but does not establish any standards or requirements.

interest which disciplines a controlling group acting in unison."
*Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 602-603. The
plaintiff recognized the obstacles she faced when she testified,
"I would like to know what's going on with my share[s] . . .
but not to have [the defendants] against me like they were for
my husband. I wouldn't have a chance."

b. *Requests for financial and operating information.* After the
special meeting, the defendants declined essentially all of the
plaintiff's requests for information. In his letter, Jordan stated
that Malden would continue its practice of supplying sharehold-
ers only annual unaudited statements, denied her request for
Federal and State tax returns, and generally stated that the offic-
ers and directors were in control of expenditures. He stated that
it had been a long-standing practice not to pay dividends, so as
to maintain an adequate cash reserve.

There is ample indication in the record, as the judge found,
that the defendants "continued to withhold financial and
operational information from [the plaintiff] well into the course
of the present lawsuit." It is apparent that the issues of giving
the plaintiff the financial information she sought, as well as the
failure to hold annual meetings, still were of concern during the
trial. At the conclusion of the trial, the judge issued an injunc-
tion with her decision, which requires the defendants to provide
financial statements.[11]

The defendants assert that they had no legal duty to provide
financial information to the plaintiff prior to the time she filed
her complaint. In any event, they claim that all the requested
information was given to the plaintiff before the beginning of
the trial and that she then dismissed the count in her complaint
for an accounting. While the defendants may have complied
with the injunction by furnishing the information sought by the
plaintiff, there is no indication that they complied with their
obligation to hold annual meetings. No further annual meetings

---

[11]The judge also ordered the defendants, inter alia, to hold an annual meet-
ing on June 17, 2002, or soon thereafter; to provide financial statements for
the years 1998 through 2001 at least seventy-two hours in advance of that
meeting; and to vote for the plaintiff's nominee for director (unless they had a
legitimate business reason for not doing so). The judge also ordered Malden
not to make any expenditure of more than "$5,000 without the approval of
[the plaintiff's] nominee for director."

have been held since 1997, and no annual statements have been issued to the plaintiff.

Taken together, these actions, denying the plaintiff a corporate office and severely limiting her to annual, unaudited financial statements, excluded her from any meaningful role in Malden's operations, and given Malden's policy of not paying dividends, she would derive no benefit from her shares. A shareholder barred from corporate office not only is "severely restrict[ed from] participation in the management of the enterprise, [but] is relegated to enjoying those benefits incident to [her] status as a stockholder." *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. at 850. The judge found that there was "ample evidence support[ing] a conclusion that the defendants benefitted from their status as shareholders in Malden while the plaintiff received no benefit from her status as a shareholder."[12]

The defendants have not demonstrated a legitimate business purpose for their actions. "[W]hen minority stockholders in a close corporation bring suit against the majority alleging a breach of the strict good faith duty owed to them by the majority, [a judge] must carefully analyze the action taken by the controlling stockholders in the individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action." *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. at 851.

Thus, as matters stood following the special meeting, the plaintiff was without any reasonable alternative except to attempt to sell her shares to Malden, but that effort also was frustrated by the defendants.

c. *The plaintiff's request that Malden purchase her shares.* The defendants repeatedly state that the plaintiff did not follow the stock transfer restriction provision prior to commencing this case and that her complaint did not assert a claim for the value of her stock. To the extent that the defendants seek to show that the plaintiff's claim for the purchase of her shares as a remedy

---

[12]Jordan has an employment contract with Malden, is paid a salary, and receives various benefits. Barbuto owns the building in which Malden operates, is paid rent, and obtained a loan from Malden to pay off his mortgage. Barbuto also owns a company which subcontracts work to Malden for which Malden is paid.

for the alleged breach of their fiduciary duty was not properly in the case, the defendants both ignore the procedural history of this case and the central issue developed for trial.

The judge made no specific findings regarding the procedures that the parties engaged in to determine the sale price of the plaintiff's shares, even though she clearly raised the issue in the pretrial memorandum and during trial. Much of that evidence is documentary and is in our record. We properly may take it into account in evaluating the defendants' actions to determine whether the plaintiff sufficiently has made out her case for a breach of fiduciary duty on the entire record. Compare *Shear* v. *Gabovitch*, 43 Mass. App. Ct. 650, 653 (1997). The judge's "decision imports every finding essential to sustain it if there is evidence to support it." *Mailer* v. *Mailer*, 390 Mass. 371, 373 (1983).

The plaintiff responded to Jordan's suggestion that if she were interested in offering her shares for purchase by Malden, she should follow the stock transfer restriction provision in the articles of organization. That provision, fully quoted in the margin, establishes an arbitration process to determine the value of the shares offered, if the directors initially do not accept the price which the seller proposes.[13] The plaintiff, invoking the

---

[13]Article 5 of the articles of organization provides certain restrictions on the transfer of shares, as follows:

"Any stockholder, including the heirs, assigns, executors or administrators of a deceased stockholder, desiring to sell or transfer such stock owned by him or them shall first offer it to the corporation through the Board of Directors in the manner following:

"He shall notify the Directors of his desire to sell or transfer by notice in writing which notice shall contain the price of which he is willing to sell or transfer and the name of one arbitrator. The directors shall within thirty days thereafter either accept the offer or by notice to him in writing name a second arbitrator, and these two shall name a third: it shall then be the duty of the arbitrators to ascertain the values of the stock, and if any arbitrator shall neglect or refuse to appear at any meeting appointed by the arbitrators, a majority may act in the absence of such arbitrator.

"After the acceptance of the offer, or the report of the arbitrators as to the value of the stock, the directors shall have thirty (30) days within which to purchase the same at such valuation, but if at the expiration of thirty days, the corporation shall not have exercised the right so to purchase, the owner of the stock shall be at liberty to dispose of the same in the manner he may see fit.

provision, filed the required notice on October 29, 1998.[14] The plaintiff stated a price and named her arbitrator. Malden, apparently not accepting the plaintiff's offering price, responded within thirty days and named its arbitrator. However, on March 19, 1999, Malden's attorney notified the plaintiff that because the parties had agreed to engage in mediation, they also had agreed to "place on hold" the arbitration process, but if mediation did not resolve issues with respect to the stock sale, the parties would return to the procedure under the articles of organization. The plaintiff's attorney replied that he would agree to place that procedure on hold, but would not waive a claim of a breach of fiduciary duty to the plaintiff for delay in the arbitration process.

The arbitration process was not completed. The plaintiff was informed by letter on August 27, 1999, that Malden did not want to purchase her shares and that Malden waived the stock transfer restriction provision. At trial, Jordan acknowledged that the plaintiff and Malden had begun the arbitration process, but he testified that "when I was made aware of what the costs were going to be, I cancelled the mediation and decided we would just go to trial. . . . I wasn't going to bear the expense of the appraisal [of the plaintiff's shares]."

On appeal, the defendants emphasize that they did not hinder the plaintiff from selling her shares to outsiders and that they essentially encouraged her to do so by waiving the stock transfer restriction. In these circumstances, however, we think this action of the defendants was a further step toward placing the plaintiff in a disadvantageous position as a minority shareholder. It long has been known that "in a close corporation, the minority stockholders may be trapped in a disadvantageous situation. No outsider would knowingly assume the position of the disadvantaged minority. The outsider would have the same difficulties." *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 592. "[T]he executor or administrator of the estate of a deceased

"No shares of stock shall be sold or transferred on the books of the corporation until these provisions have been complied with, but the Board of Directors may in any particular instance waive the requirements."

[14]The record does not indicate what, if any, contacts occurred between the parties in the approximately fourteen months from Jordan's letter to the plaintiff's request for valuation of her shares.

shareholder in a close corporation will be confronted with an il-liquid asset . . . . [T]he only prospective purchasers for the stock may be the remaining shareholders in the corporation or the corporation itself." *Goode* v. *Ryan*, 397 Mass. 85, 90 (1986).[15] Accordingly, encouraging the plaintiff to sell her shares to an outsider was, as the judge opined, "not a true opportunity [for the plaintiff] to dispose of her shares." There is little doubt that the judge correctly described the conduct of the defendants toward Brodie as a continuation of a pattern of "stonewalling."

We think the defendants have seriously minimized the significance of the stock transfer restriction provision in Malden's articles of organization. It is a provision of corporate governance, compare *Goode* v. *Ryan*, 397 Mass. at 91, and is not to be taken lightly.[16] A corporation's articles of organization and by-laws, together with State corporation law, "regulate the manner in which a company's officers and directors must conduct the company's business." *ER Holdings, Inc.* v. *Norton Co.*, 735 F. Supp. 1094, 1097 (D.Mass. 1990). A fair reading of the stock transfer restriction provision indicates that when given notice by a stockholder proposing a price, if that price is not ac-cepted, the directors *shall* take certain steps to determine, by arbitration, the value of the shares offered.[17] While the provi-sion does not require that the directors ultimately purchase the

[15]The defendants claim the judge erroneously found that while the defendants gave the plaintiff permission to sell her shares on the open market, they "essentially hindered her ability to [do so] by refusing to provide [her] with relevant information concerning the value, financial position and opera-tion of the corporation that would enable her to obtain a fair return on her asset." We take this finding to be based, in part, on the evidence discussed above. To the extent that the finding lacks an evidentiary basis, we view the error as insignificant because there is no evidence that the plaintiff offered her shares for sale to outsiders.

[16]The stock transfer restriction provision appears to be reasonable and protects Malden. "[O]riginal owners commonly impose restrictions on transfers of stock designed to prevent outsiders who are unacceptable to the other stockholders from acquiring an interest in the close corporation." *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 587 n.13. For a citation detailing the long history of such provisions, see *New England Trust Co.* v. *Abbott*, 162 Mass. 148, 152 (1894).

General Laws, c. 156D, § 6.27(*d*)(1), states that articles of incorporation may include a requirement obligating a stockholder first to offer the corpora-tion an opportunity to acquire the restricted shares.

[17]The defendants mischaracterize the stock transfer restriction provision as

shares, and permits the directors to waive its requirements, in this case the waiver was made after Malden agreed to follow the arbitration process, and the process was terminated because of Jordan's view of the expense of the mediation and arbitration procedures. In these circumstances, waiving the stock transfer restriction provision and deciding to go to trial was arbitrary and contrary to the purpose of Malden's articles of organization. Contrast *Goode* v. *Ryan*, 397 Mass. at 91 ("refusal [to purchase] violated no agreement or corporate governance provision and did not violate any fiduciary obligation [the majority shareholders] owed to the plaintiff").

Again we ask whether the defendants' actions demonstrated a "legitimate business purpose." *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. at 851. The judge found that "[n]othing presented by the defendants supports a finding that the defendants' actions were undertaken for a legitimate business purpose." On appeal, the defendants have advanced no argument in support of any such purpose for their decision not to complete the arbitration process.[18] We determine that the defendants were in breach of their fiduciary duty in terminating the arbitration process and that they stonewalled every effort made by the plaintiff to secure a valuation of her shares. By their actions, the defendants further restricted whatever market

a "right of first refusal." It more properly should be termed a "right of first offer," because it gives Malden the opportunity to purchase the shares before they are offered to a third party. Ordinarily, exercising a right of first refusal requires that the seller have received an offer from a third party. See Southgate & Glazer, Corporation Law Practice § 6.10 n.64, at 143 (Supp. 2003) (noting the "significant deterrent effect" of a first refusal provision requiring a stockholder first to obtain a bona fide offer from a prospective buyer).

[18]The judge noted that Malden previously purchased the shares of Agri when he resigned in 1979. The minutes of a meeting of Malden indicate that Agri, pursuant to the articles of organization, offered his shares for $50,000, and Malden agreed to decide within thirty days whether to accept the offer. It is apparent that the parties thereafter negotiated a price of $25,000 and, therefore, did not invoke the arbitration process.

The record does not indicate why Walter Brodie did not invoke the arbitration provision, or whether he and the defendants ever considered using it. Walter Brodie's request to sell his shares met with opposition from Jordan, who considered him a "nuisance." Barbuto testified that Walter Brodie kept proposing different prices and ultimately, the matter "just died."

there might have been for the plaintiff's shares. Our determination is consistent with, and supports, the judge's conclusion.[19]

We conclude the judge correctly ruled that the defendants conduct constituted a freeze-out of the plaintiff. There was ample evidence of the defendants' exclusion of the plaintiff from the management and operations of Malden and their refusal to complete in good faith a determination of the value of the plaintiff's shares to support the judge's conclusion that the plaintiff was frozen out of Malden.

"The determination whether a breach of [the fiduciary duty of the majority shareholders] has occurred is a matter of law for the court, as is the remedy for such breach." *Merola* v. *Exergen Corp.*, 423 Mass. at 464. The judge's ultimate conclusion that the defendants were in breach of their fiduciary duty to Brodie is neither clearly erroneous nor inconsistent with the relevant legal standard. *Yankee Microwave, Inc.* v. *Petricca Communications Sys., Inc.*, 53 Mass. App. Ct. at 504.

2. *The order to purchase the plaintiff's shares.* In deciding an appropriate remedy for the plaintiff, the judge determined that the "defendants' actions have left [the plaintiff] with no true alternatives as she was shut out of the corporation and given no true opportunity to dispose of her shares. [The Brodies] clearly wished to sever their relationship with the defendants and Malden." The judge exercised the court's equitable power to put the plaintiff in the position she would have been in if there had been no wrongdoing by the defendants, by ordering the defendants to purchase the plaintiff's shares "at a price to be agreed upon by the parties in accordance with the testimony of [the court-appointed expert at trial]."[20]

The defendants have a different, and mistaken, view of the position the plaintiff should be placed in. They argue that they complied with the injunction by supplying financial information to her, that the alleged wrongdoing was remedied, and that the

---

[19]Even though our legal analysis of the stock transfer restriction provision differs somewhat from that of the judge, it is not contrary to her conclusions. "[W]e are free to adopt different reasoning and affirm a judgment on grounds not specifically relied upon by the judge." *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993), and cases cited.

[20]Again, it is worth noting that the corporation had purchased the shares of Guy J. Agri in the past.

plaintiff was placed in the same position she would have been in if there had been no wrongdoing. Accordingly, they assert that ordering payment of the plaintiff's shares would be an extra remedy and thus a "windfall." Once again, the defendants ignore the history of this case. Supplying the financial information the plaintiff requested would only have returned her to the isolated position she found herself in before she gave notice that she wanted to sell her shares; that is, without corporate office and promised only annual, unaudited financial statements. Payment for her shares, therefore, cannot be construed as a windfall. The defendants have not demonstrated that the remedy was designed to punish them.

"A court exercising traditional equity powers has the power to remedy the wrong complained of and to make the decree effective." *Bodio* v. *Ellis*, 401 Mass. 1, 10 (1987), quoting from *Hallahan* v. *Haltom Corp.*, 7 Mass. App. Ct. 68, 71 (1979). See *Zimmerman* v. *Bogoff*, 402 Mass. 650, 661 (1988), and cases cited. A judge has "broad powers" to "fashion an appropriate remedy for [breaches of fiduciary duty] in closely-held corporations." *Demoulas* v. *Demoulas*, 428 Mass. 555, 591 (1998).

While no Massachusetts appellate decision ordering the purchase of a minority stockholder's shares in circumstances closely similar to this case has been brought to our attention, nor are we aware of one, we think the judge's order is fundamentally supported by *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 603 (in circumstances where a corporation's purchase of shares of a majority stockholder was a breach of fiduciary duty to a minority stockholder, relief could be ordered by requiring the corporation to purchase the minority stockholder's shares on equal terms). Compare *Goode* v. *Ryan*, 397 Mass. at 91 (where majority shareholders did not breach their fiduciary duty to the minority shareholder and where the corporate by-laws did not provide for a buy out on the death of a shareholder, the corporation was not required to purchase the decedent's shares). "As is characteristic of equity practice, the final relief awarded in *Donahue*-type cases has been varied and creative, as trial judges (and, as necessary, appellate courts) have exercised their discretion to tailor their relief to the nearly limitless variety of fact patterns

presented."[21] Billings, Remedies for the Aggrieved Shareholder in a Close Corporation, 81 Mass.L.Rev. 3, 6 (1996). See generally 12B Fletcher, Cyclopedia of the Law of Private Corporations § 5820.10 (2002 & Supp. 2005).

While there rarely is a market value for a small, close corporation's shares that bears any relation to the shares' true value, a freeze-out absolutely destroys whatever value otherwise exists. Where there is a freeze-out, the remedy ordered here restores to the plaintiff what she lost — or an approximation thereof — in the only way possible. The remedies the dissent proposes all would have the effect of forcing the plaintiff into a relationship she did not want, and the other directors did not want either, indeed, into a relationship from which the plaintiff had been frozen out. Forcing the parties to maintain a relationship none of them wants is not good for them or for the corporation and is bound to breed more litigation.

3. *Addition of prejudgment interest.* The defendants also argue that the application of interest pursuant to G. L. c. 231, § 6B, is inappropriate because prejudgment interest is applied for the loss of use of money. The defendants overlook the well-settled principle that "a corporate 'freeze-out' claim has more of the characteristics of a tort claim than of a contract claim." *Kirley* v. *Kirley*, 25 Mass. App. Ct. 651, 653 (1988). It is not error to apply interest according to G. L. c. 231, § 6B, to judgments where liability is based on a breach of fiduciary duty. Cf. *Lattuca* v. *Robsham*, 442 Mass. 205, 209-210 (2004). See *Sugarman* v. *Sugarman*, 797 F.2d 3, 14, 15 (1st Cir. 1986) (claim of a "freeze-out" is "within a classic tort action," and precedent establishes that G. L. c. 231, § 6B, applies to a calculation of interest for a breach of fiduciary duty). See Southgate & Glazer, Corporation Law & Practice § 13.8 (Supp. 2003).

---

[21]The dissent does not indicate how the remedy in this case has exceeded the equitable powers of the Superior Court judge or why the dissent believes the remedy the dissent suggests is workable in the facts and circumstances of this case. It is also unclear how requiring the majority to purchase the plaintiff's shares would put her in a better position than if the defendants had fulfilled their fiduciary duty. Once again, "[a] court with equity jurisdiction has broad and flexible powers to fashion remedies." *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation*, 424 Mass. 430, 463 n.24 (1997).

4. *The valuation calculation.* Neither in their opposition to the plaintiff's motion nor on appeal do the defendants dispute the judge's valuation amount, or any of the component asset and liability values. The plaintiff, however, requests in the concluding paragraph of her brief that we "correct" the judge's calculation of the valuation amount. In a footnote at the end of her statement of facts, she claims that in the original order, the judge omitted two assets appearing in the court-appointed expert's report which, if added, would raise the valuation of her shares to $135,000, a value at the upper end of the range the expert testified to at trial. We observe that the plaintiff made a similar assertion in a footnote in her motion to amend, stating that the judge "inadvertent[ly]" omitted assets of approximately $118,089. In her decision on the motion to amend, the judge restated her finding of shareholder equity of $283,549, and declined to eliminate a reduction she applied as a reserve for the potential environmental liability, but made no reference to the plaintiff's assertion of the allegedly omitted assets.

We decline to consider this issue in depth. As raised by the plaintiff, the alleged omission is not in the nature of a clerical error, but appears to be a "substantive issue of disputed fact." *M.B. Claff, Inc.* v. *Massachusetts Bay Trans. Authy.*, 441 Mass. 596, 602 (2004). The plaintiff offers no meaningful argument on this issue on appeal. Contrary to her assertion, it appears likely that the omission was an exercise of the judge's discretion to include only those assets she stated as "cash, securities, and equipment." These categories of assets would not include the accounts and mortgage receivables the plaintiff asserts should have been included. The judge did not comment on this aspect of the plaintiff's motion to amend, yet the plaintiff did not raise this issue to the judge in a motion pursuant to Mass.R. Civ.P. 60, 365 Mass. 828 (1974). In any event, her failure to cross-appeal on this issue precludes her from obtaining a more favorable judgment than she obtained in the Superior Court. Cf. *Hartford Ins. Co.* v. *Hertz Corp.*, 410 Mass. 279, 288 (1991).

5. *The attachment and injunction.* We need not address the several complaints of the defendants concerning the attachment or the injunction restraining the defendants from transferring certain of their properties or from selling, transferring, assign-

ing, or pledging securities currently held by Malden. The judge properly applied the provisions of Mass.R.Civ.P. 4.1(a), 365 Mass. 737 (1974), and G. L. c. 223, § 86A. See *Sullivan* v. *First Mass. Financial Corp.*, 409 Mass. 783, 793-794 (1991). Any actions to dissolve or modify the order must be taken in the Superior Court.

*Judgment affirmed.*

KANTROWITZ, J. (concurring in part and dissenting in part). It cannot be gainsaid that the equitable powers of a judge are not unlimited. Placing a plaintiff in an even better position than if she had not been wronged, and economically punishing the defendant, is an improper exercise, in my view, of those considerable powers. What is particularly troubling here is that the majority does not have to go as far as it does, in effect creating new law, to achieve the result it desires.

The majority notes that there are no appellate court decisions ordering the purchase of a minority stockholder's shares.[1] That alone should give us pause prior to venturing onto uncharted waters, especially when other equitable options are potentially, if not readily, available, e.g., naming Mary Brodie as a director, officer or employee if she so desired; awarding her damages for having been deprived of a sought-after position in the past; awarding her a share of the company's life insurance proceeds that it collected upon her husband's death[2]; if dividends were wrongfully withheld by, or excessive salary was paid to, the appellants, awarding Brodie her fair share of those monies.

---

[1]In support of its position, the majority relies upon *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. 578, 603 (1975). That case, however, is readily distinguishable. *Donahue* holds that if a company repurchases its stock from a majority stockholder, it must also offer the same option at the same price to a minority one. As this was not done, the Supreme Judicial Court suggested two alternative solutions for the company: either rescind the deal with the majority stockholder or offer the minority the same deal it offered the majority.

[2]Malden had taken out "key man insurance" in the amount of $100,000, payable to the company on the death of each of the three shareholders, Walter S. Brodie, David J. Barbuto, and Robert J. Jordan. The judge found that such money was not earmarked for repurchase. On Walter Brodie's death in 1997, Malden deposited the $100,000, into Malden's brokerage account. It is unclear what became of that money and who benefited from it.

Ordering the purchase of stock contravenes the governing documents of the corporation that provide for stock transfer. The bottom line is that the corporation is not required to purchase the shares. While it surely would have been preferable for the appellants to have followed the procedure set forth, ultimately, even if they had, they still had the clear option of refusing the purchase, which is what they did here. They thus exercised a right given them under the corporate structure. The court's decision compels them to do what they are not obligated to and, more concerning, at a price far in excess of the actual value of the stock.[3]

While I agree with various aspects of the well-written majority opinion, I cannot agree with its remedy — ordering the repurchase of the shares — thus punishing the appellants, which, I fear, will now needlessly open the floodgates in this area of the law.

---

[3]"We deem a close corporation to be typified by: . . . (2) no ready market for the corporate stock . . . ." *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 586.