Botsford, Margot, J.
The plaintiff, Michael J. Murphy (Murphy) brings this action for declaratory relief and damages against Clyde N. Grey, Jr. (Grey), Joseph R. Onorato (Onorato), and Newbuiy Design Associates, Inc. (NDA, or the corporation) (collectively, the defendants). Murphy seeks a declaration that the defendants are obligated to redeem his shares of stock at a total value of $300,000 under the terms of the parties’ shareholder agreement (Count I), and further alleges breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), and breach of fiduciary duty (Count IV).
The defendants now move for summaiy judgment on all counts. Murphy opposes the defendants’ motion, and has filed a cross motion for partial summaiy judgment on Counts I and II. For reasons discussed below, the defendants’ motion for summaiy judgment is allowed and Murphy’s cross motion for partial summary judgment is denied.

*257
BACKGROUND

The facts are taken from the summary judgment record in the light most favorable to the plaintiff. In 1993, Murphy, Grey, and Onorato founded the architectural design firm, NDA, as co-equal, one-third shareholders[2] On March 30, 2001, the shareholders executed a buy-sell agreement (the Agreement) to “provide for the purchase by the Corporation of the stock interests held by all Shareholders at the death, disability or withdrawal of a Shareholder ...”
Article X of the Agreement provides as follows:

LIFETIME TRANSFER

10.1 Any stockholder desiring to sell, transfer or pledge stock owned by him or her, shall first offer it to the Corporation through the Board of Directors at the value established as providedfor in Article III. The offer shall be in writing and shall be accompanied with the stock certificate or stock certificates held by the shareholder and the shareholder’s resignation from all corporate offices.
No shares of stock may be sold or transferred on the books of the corporation until these provisions have been complied with, but the Board of Directors may, in any particular instance, waive the requirement.
10.2 Payment Unless other mutually agreed upon financial arrangements are made, the Corporation shall pay for such stock as follows:
. . . [description of payment plan).
(Emphasis supplied.) Article III of the Agreement provides for a fixed valuation of $900,000 for all of the capital stock of the corporation and states that this amount “shall remain the value of such stock for the purpose of this agreement until such time as such stock is reappraised by the parties hereto . . The shareholders never reappraised the stock, and thus the fixed value of $900,000 remained the valuation at all times relevant to this case.
On December 10 and December 13, 2004, Murphy conducted one-on-one meetings with four of the six NDA employees to talk to them about their “lackadaisical work habits and ethics and tiy to shake things up.” Murphy knew that Grey and Onorato would not approve of these meetings and he did not consult them first.[3] Murphy told three of the employees, whom he agreed were “the meat and potatoes of the company,” that they were not “company men.” At least two of the employees were, in Murphy’s words, “pretty upset” with him. One employee wrote an email to Murphy defending his commitment to the company. Another employee interrupted the meeting, went directly to Onorato’s office, and asked him to join the meeting. Onorato went to the meeting and personally observed Murphy’s conduct.
On December 15, 2004, the three shareholders met to discuss Murphy’s unilateral meetings with the employees. Grey and Onorato told Murphy that his actions had offended the employees and asked him to leave the firm.[4] Murphy felt that he had no choice but to accept the collective decision of the majority shareholders to terminate his employment.
On December 17, 2004, Murphy met with the defendants to discuss the valuation of his shares of stock.[5] Murphy agreed to hire an attorney to represent him in the discussion with NDA’s attorney, Robert Snider (Attorney Snider), regarding how to work out a purchase of his shares by NDA. Murphy retained Thomas Flannagan (Attorney Flannagan). In a letter dated January 25, 2005, the attorneys agreed to have NDA’s corporate accountant compile an opinion as to the fair market value of NDA and then have a consultant retained by Murphy review this report for purposes of settlement. The defendants agreed to bear the cost of the valuation report and to contribute to the cost of Murphy’s expert review of that report.
On April 13, 2005, NDA’s corporate accountant issued a report which estimated the value of Murphy’s one-third interest in NDA at $75,000. The defendants forwarded a copy of the report to Attorney Flannagan on April 14, 2005. On June 3, 2005, Attorney Snider sent a fax to Attorney Flannagan in which he noted that he had not received a response to the report. Attorney Flannagan did not respond directly to Attorney Snider’s June 3, 2005 fax. Instead, on June 16, 2005, Attorney Flannagan wrote directly to NDA’s board of directors and formally “offered” Murphy’s shares to the company pursuant to Article X of the Agreement. In the letter Attorney Flannagan demanded payment of $300,000 for Murphy’s shares, which he claimed was the “predetermined” value of the shares, according to Article III.[6] He stated that NDA’s report was ‘seriously flawed" and any analysis of the actual value of the shares was “irrelevant” given this predetermined figure.
After June 16, 2005, Attorney Flannagan did nothing further to pursue the process that was set forth in the January 25, 2005 letter. NDA declined Murphy’s offer to sell his shares to the Company for $300,000 and Murphy instituted this action. Neither before nor after his offer to sell his shares to NDA did Murphy attempt to sell or transfer his shares to a third party.

DISCUSSION

A. Standard of Review

Summary judgment shall be granted where there are no genuine issues as to material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of showing affirmatively the absence of triable issues, and that the moving party is entitled to a judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17(1989). A party moving for summary judgment, not bearing the burden of proof at trial, may demonstrate the absence of a triable *258 issue by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). A moving party can meet its burden by showing that the nonmoving party lacks evidence to support the non-moving party’s case. See Kourouvacilis, 410 Mass. at 711.
B. Analysis

1. The Agreement

Counts I, II, and III of Murphy’s complaint are premised on the Agreement, which, he asserts; obligates the defendants to redeem his shares for a predetermined sum of $300,000[7] and which he claims the defendants have violated. Where, as here, the dispute relates to the proper interpretation and application of a contract in light of undisputed facts, a question of law is presented. Lexington Ins. Co. v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995). The court must interpret the words in a contract according to their plain meaning and determine the objective intent of the parties in making the contract. Polito v. School Comm. of Peabody, 69 Mass.App.Ct. 393, 396 (2007). Where there is no ambiguity in the contract, it must be enforced according to its terms. Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970).
Two articles in the Agreement expressly obligate NDA to purchase shares of a stockholder in two different circumstances: upon the death of a shareholder (Article II),[8] and on the total and permanent disability of a shareholder (Article XI).[9] These provisions use mandatory language to create mutual obligations on the part of the shareholder to sell, and the corporation to buy. In contrast, Article X, in Section 10.1, directs a shareholder to “offer” his shares to the corporation, but does not contain any mandatory repurchase language: “Any stockholder . . . shall first offer [the stock] to the Corporation . . .” (Emphasis supplied.)[10]
The use of the mandatory purchase language in Articles II and XI shows that the drafters of the Agreement certainly knew how to express in explicit terms the corporation’s obligation to buy back the shares of a shareholder when that was the intended result. The absence of any similar language of purchase obligation in Article X is reasonably understood to reflect an intent not to require the corporation to buy back the shares in the circumstances covered by that article, viz., a withdrawing shareholder who is alive and not disabled. See, e.g., Boston Safe Deposit & Trust Co. v. Wilbur, 431 Mass. 429, 433 (2000); Brown v. Little, Brown & Co., 269 Mass. 102, 114 (1929). Cf. First Nat'l Bank v. Judge Baker Guidance Center, 13 Mass.App.Ct. 144, 153 (1982) (where legislature uses specific language in one part of statute but not other parts that treat the same subject, “the language should not be implied where it is not present”).
A contract must be construed to give reasonable effect to all of its provisions. J.A. Sullivan v. Commonwealth, 397 Mass. 789, 795 (1986). Following the direction given in the first paragraph of Article X, Section 10.1, that a selling shareholder first offer his shares to NDA, the second paragraph provides that “(n]o shares of stock may be sold or transferred on the books of the corporation until these provisions have been complied with, but the Board of Directors may, in any particular instance, waive the requirement.”[11] If Article X is read to require NDA to buy back all shares offered by a shareholder wishing to sell them— the position taken by Murphy — then this provision about selling or otherwise transferring any interest shares of stock — a provision that is similar to Section 1.2 of the Agreement — would make no sense, because there would be nothing to sell or transfer. The same is true of the waiver provision at the end of the quoted sentence: if the corporation must always buy back a withdrawing shareholder’s shares, there is nothing to waive. Presumably, the quoted provisions in Sections 10.1 and 1.2 are supposed to have meaning, and a construction of the Agreement that deprives them of any significance is to be avoided. See Worcester Mut. Ins. Co. v. Marnell, 398 Mass. 240, 245 (1986) (reading of a contract “which gives a reasonable meaning to all [its] provisions ... is to be preferred to one which leaves a part useless or inexplicable”[quotation and citation omitted]).
In sum, I conclude that Article X of the Agreement does not require NDA to purchase the proffered shares of Murphy in the circumstances of this case, but simply provides that Murphy must first offer those shares to NDA, and if NDA does not accept the offer, Murphy is then free to sell or dispose of the shares in any way he chooses.[12] The defendants are entitled to summary judgment in their favor on Counts I and II of Murphy’s complaint.
With respect to Count III, in which Murphy claims a breach of the implied covenant of good faith and fair dealing, the rule is that “(t]he scope of a covenant [of good faith and fair dealing] is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 126 S.Ct. 397 (2005). Accord, Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007). While a minority shareholder in a close corporation is susceptible to oppression by the majority or controlling shareholders, see, e.g., Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 849-50 (1976), absent a provision in a company’s articles of incorporation, by-laws, or shareholder agreement, “neither the corporation nor a majority of shareholders is under any obligation to purchase the shares of minority shareholders when minority shareholders wish to dispose of their interest in the corporation,” Goode v. Ryan, 397 Mass. 85, 90-91 (1986) (“refusal [to purchase] violated no agreement or corporate governance provi *259 sion and did not violate any fiduciary obligation [the majority shareholders] owed to the plaintiff’); Barrett v. W.A. Webster Lumber Co., 275 Mass. 302, 307-08 (1931) (decision to repurchase stock by the corporation rests in the “sound discretion of the directors”). Since Article X by its terms does not obligate NDA to buy Murphy’s shares in the present set of circumstances, it is not possible to read such a requirement in under the guise of the implied covenant of good faith and fair dealing. The defendants’ motion for summary judgment on Count III will be allowed.
2. Breach of Fiduciary Duty — Count IV
Murphy claims that the defendants breached their fiduciary duty by (1) diverting profit sharing distributions for 2004 that otherwise would have been paid to him, (2) forcing him out of the company’s employment, and (3) intentionally disregarding the terms of the Agreement that require his shares to be redeemed at a predetermined value. It is undisputed that NDA is a close corporation, and that the stockholders in a close corporation owe one another a fiduciary duty of “utmost good faith and loyalty.” Donahue v. Rodd Electrotype Co., 367 Mass 578, 593 (1975) (citation omitted). “The determination of whether a breach of [the fiduciary duty of the majority shareholders] has occurred is a matter of law for the court, as is the remedy for such breach.” Merola v. Exergen Corp., 423 Mass. 461, 464 (1996). I will discuss each claim in turn.

a. Diversion of Profit Sharing Distributions

Murphy conceded that he received profit sharing for the year 2004 and that he was “no longer claiming that there was a breach of fiduciary duty as set forth in paragraph 31 [of his Complaint].”[13] However, he still claims that he did not receive profit distributions during 2004 as a shareholder, presumably in the form of dividends.
The courts generally do not interfere with the sound fiscal management of the corporation by its director, and the general rule is that the declaration of dividends rests within the discretion of the directors. The courts will interfere only where the failure to declare dividends is either a plain abuse of discretion or part of a plan to freeze out a minority shareholder.
Donahue v. Rodd Electrotype Co., supra, 367 Mass at 589. The summary judgment record does not contain any evidence to indicate that, during the time covered by that record, the defendants have abused their discretion in not declaring dividends. Accordingly, Murphy has no reasonable possibility of succeeding on this claim of breach of fiduciary duty.

b. “Freeze Out"

Murphy contends that the defendants’ termination of his employment constituted a “freeze out” and therefore the defendants breached their fiduciary duty. “It is not sufficient for a party challenging a transaction to merely label it a ‘freeze out.’ Freeze-outs [sic.], by definition, are coercive and manifestly inequitable.” Leader v. Hycor, Inc., 395 Mass. 215, 221 (1985). A minority shareholder must demonstrate either that the majority’s action lacked a legitimate business purpose or that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interests. Wilkes v. Springside Nursing Home, Inc., supra, 370 Mass. at 851-52.
Again, focusing, as I must, on the summary judgment record and the time period that it covers, there is no indication of any oppressive conduct on the defendants’ part directed at or motivated by a desire to exclude Murphy from the benefit of shares. That record indicates that the defendants’ decision to terminate Murphy’s employment was based on the business purpose they have articulated: a desire to avert further damage to company morale and to avoid the possible loss of staff on account of Murphy’s actions, and in particular his unilateral and disruptive meetings with the employees. “[T]he controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. It must have a large measure of discretion, for example, in . . . dismissing directors with or without cause, and hiring and firing corporate employees.” Id. at 851. Accord, Merola v. Exergen Corp., supra, 423 Mass. at 464. Here, the record reflects a concern about Murphy’s behavior towards employees in a veiy small firm, and a breakdown of the relationship among the three shareholders and principals; it also appears that the breakdown had been building over time. While someone else may have taken a different approach than Grey and Onorato took to Murphy’s conduct in December of 2004, the record does not indicate their reaction had any ulterior motive, and further does not reveal any clear alternative that would have been less harmful to Murphy. Murphy appears to take the position that the defendants latched on to his meetings with the employees as a pretext and vehicle to carry out their desire to terminate his employment and thereby freeze him out of receiving the benefits of being one of the three equal shareholders of NDA. See, e.g., Wilkes, 370 Mass. at 849-50. Murphy’s belief that this was the motivation of the defendants, by itself, does not constitute admissible evidence suggesting a disputed issue of material fact. As just suggested, the record does not reveal any admissible facts to support this belief. Nor are there facts present to permit a fact finder to conclude that the majority used assets of the corporation to enrich themselves at Murphy, the minority shareholder.[14]
Murphy argues that his termination from employment, in the circumstances, has deprived him of his “reasonable expectations” of benefit from being an owner of NDA, and this is a type of freeze-out for which he is entitled to recover. See Brodie v. Jordan, 447 Mass. 866, 869-70 (2006). There can be little doubt *260 that being terminated from the corporation of which he was a co-owner and co-founder would frustrate Murphy’s expectations of the benefits of ownership. However, to establish that the defendants are liable, Murphy must show that the defendants acted improperly in some way — i.e., they did not have any legitimate business purpose — when they terminated him. See id. at 870; S.C., 66 Mass.App.Ct. 371, 376-79 (2006). As discussed above, however, Murphy cannot show, on this record, that the defendants had no legitimate business purpose.
What is left is Murphy’s claim that the defendants’ action has deprived him of the value of his shares, because as a practical matter they are worthless to an outside party, and therefore he is not in a position to sell them for any reasonable amount of money to anyone. The problem with this argument is that the record shows Murphy unilaterally abandoned the collective effort to reach an agreed-upon appraisal of the value of Murphy’s shares, and thereafter for the corporation to purchase those shares at the agreed-upon appraisal amount. Murphy contends the defendants acted in bad faith in performing their part of the collective effort by arriving at a value that was far too low, but there is no factual evidence in the record to support the claim, given that Murphy never obtained a counter-appraisal of the shares’ value from an accountant or appraiser of his choice. Compare Brodie v. Jordan, supra, 447 Mass. at 870 n.4, S.C., 66 Mass.App.Ct. at 379-84.

c. Intentional Disregard of the Agreement

Murphy claims that the defendants have breached their fiduciary duty by disregarding the terms of the Agreement that require his shares to be redeemed at a predetermined value of $300,000. For the same reasons discussed above, Murphy’s argument fails. The majority’s refusal to repurchase Murphy’s stock was in accord with the terms of Article X of the Agreement, and therefore did not violate any fiduciary obligation they owed to Murphy. See, e.g., Chokel v. Genzyme Corp., supra, 449 Mass. at 278.

ORDER

For the reasons discussed above, it is hereby ORDERED that the defendants’ motion for summary judgment be ALLOWED and the plaintiff s cross motion for partial summary judgment be DENIED. The defendants’ claim for attorneys fees under Article XIII of the parties’ “Shareholder’s Buy-Sell Agreement” is left open.

Onorato is a licensed architect; Grey and Murphy are project managers. From 1993 until 2004, each shareholder contributed full-time services to the company.

Athis deposition, Murphy testified, “I completely felt that had I made a formal request of my partners to sit down and have these conversations [with the employees], it would have been denied and we would have been as stagnant as we were before as far as blowing things up.” (Murphy deposition, p. 200.) Murphy also testified that he did not feel he needed permission to talk to the employees, and that he had discussed with Grey and Onorato previously his concerns about the employees’ work habits.

Murphy maintains that the defendants’ actions arose from their personal animosity towards him and a consequent desire to “freeze" him out of the company.

At this meeting Murphy was aware of the Agreement and did not tell his partners that he believed he was entitled to $300,000 for his shares under the Agreement.

Article III sets the stock value at $900,000; a third of this total is $300,000.

Count I is a claim for declaratory judgment pursuant to G.L.c. 231A and Mass.R.Civ.P. 57, where the plaintiff seeks a declaration that the defendants are obligated to redeem his shares for $300,000. Count II is a claim that the defendants’ refusal to redeem the shares at that price is a breach of contract. Count III is a claim that the defendants’ failure to redeem the shares for $300,000 has deprived the plaintiff of the “fruits of the agreement” and therefore constitutes a violation of the covenant of good faith and fair dealing.

Article II of the Agreement provides: “The shares of stock in the corporation of any Shareholder who dies will be sold to the corporation. Such sale shall take place sixty (60) days after the death of the Shareholder and on the terms and conditions hereinafter set forth. The corporation shall purchase the stock of the Shareholder who dies and make payment therefor on the terms and conditions hereinafter set forth.” (Emphasis supplied.)

Article XI of the Agreement provides in pertinent part: “In the event a Shareholder becomes ‘totally and permanently disabled’ before attaining the age of sixty (60) and remains so for a period of twelve (12) months from the onset of such disability, the disabled Shareholder (or his attorney in fact) shall sell and the Corporation shall buy the disabled Shareholder’s interest under the terms herein set forth.” (Emphasis supplied.)

Article X is quoted above in the text. (See p. 2.)

The language from Section 10.1 that is quoted in the text on this page is consistent with Section 1.2 of the Agreement which provides: “No Shareholder may sell, devise, pledge, encumber, gift or otherwise transfer in any manner or by any means whatsoever any interest in part or all of the capital stock of the Corporation now owned by or hereafter acquired by him or her without having first obtained the written consent of the Board of Directors or offered to the Corporation pursuant to the terms of this Agreement.”

In reaching this conclusion, I have not considered the history of the Agreement’s drafting, and in particular, the original draft of the Agreement under date of May 25, 2000, which had an arbitration provision as part of Article X. While it may be appropriate to consider parol evidence even where as here, a contract’s terms are unambiguous, see, e.g., SMS FinanciaL V, LLC v. Conti, 68 Mass.App.Ct. 738, 749-50 (2007), I do not find the prior history to add any greater clarity to what the words of the final version of the Agreement already provide.

Plaintiffs Response to Defendants’ Superior Court Rule 9A(b)(5) Statement of Claimed Undisputed Material Facts and Legal Elements; Plaintiffs Statement of Additional Material Facts; Plaintiffs Statement of Governing Law, pg. 60; Murphy’s Dep., JSETab B, p. 146.

In light of this result, I do not reach the defendants’ claims that Count IV is barred by the doctrines of unclean hands and waiver.